**UNITED STATES SECURITIES AND EXCHANGE COMMISSION,**
Plaintiff,

v.

**David E. FITZGERALD, Pacific Genesis Group, Inc.,**
**Defendants.**

**No. C 00–4802 CRB.**

United States District Court,
N.D. California.

Feb. 14, 2001.

James A. Howell, Robert L. Mitchell, Christopher C. Cooke, Patrick T. Murphy, Securities and Exchange Commission, San Francisco, CA, for Plaintiffs.

Peter A. Sandmann, Tesler, Sandmann & Fishman, San Francisco, CA, Jerry A. Isenberg, Thomas J. McGonigle, McGuire Woods LLP, Washington, DC, for Defendants.

## FINDINGS OF FACT AND CONCLUSIONS OF LAW REGARDING THE PLAINTIFF'S APPLICATION FOR A PERMANENT INJUNCTION

BREYER, District Judge.

Now before the Court is the plaintiff's application for a permanent injunction. Pursuant to Federal Rule of Civil Procedure 52(a), the Court hereby issues the following Findings of Fact and Conclusions

of Law. The plaintiff's request for a permanent injunction is hereby GRANTED.

# I. FINDINGS OF FACT

## A. Introduction

1. This litigation involves a land development project known as the Rancho Lucerne Master Planned Community ("the project," "the development," or "Rancho Lucerne") located in San Bernardino County, California. The project envisions a community with up to 4,257 single family homes on 1,375 acres, a twenty-seven-hole "replica" public golf course, and thirty acres of commercial property. The developer of the project is Pacific Golf Community Development LLC ("Pacific Golf" or "the developer"), a California limited liability company. The manager and principal of Pacific Golf is Mr. Manoucher Sarbaz.[1]

2. In the course of financing the project, Mr. Sarbaz has worked closely with the defendant Pacific Genesis Group, Inc. ("PGG"), a broker-dealer registered with the United States Securities and Exchange Commission ("SEC" or "Commission") and the National Association of Securities Dealers ("NASD"). PGG underwrites municipal securities, primarily in California. The defendant Mr. David Fitzgerald is the Chairman and Chief Executive Officer of PGG.

3. In late December 2000, the SEC filed a complaint and an application for injunctive relief against the defendants, alleging that they had violated various provisions of the federal securities laws in acting as the underwriter for bond offerings used to finance the project. That complaint now requires this Court to determine whether it should permit the latest bond offering on the project to move forward, and, if so, under what conditions.

4. The factual record before the Court is fairly complicated, so it is useful to briefly outline the structure of these Findings of Fact and Conclusions of Law. In presenting its Findings of Fact, the Court will begin with a general description of the project's concept and the process for developing it. Second, the Court will describe in more detail the people and entities involved in the project, including Mr. Sarbaz and Mr. Fitzgerald. Third, the Court will turn to the defendants' role in developing and financing the project. Fourth, the Court will describe the problems that have been identified with the development, including: (a) how the developer intends to repay bondholders; (b) the substantial amount of debt incurred on the project and whether the developer can repay bondholders with proceeds from the project; (c) how proceeds from the prior offerings have been used, and how proceeds from the current offering will be used absent an injunction; (d) the nature of the developer's contracts with potential buyers of the lots; and (e) the developer's failure to meet its projections. Fifth, the Court will review the standard of care for municipal securities underwriters. Sixth, the Court will summarize the evidence regarding the alleged misrepresentations and omissions committed by the defendants. Finally, the Court will briefly describe the procedural history of the suit.

5. In presenting its Conclusions of Law, the Court will begin by outlining the standard for a permanent injunction issued under the federal securities laws. Next, the Court will describe what constitutes a violation of the securities laws. Then the Court will evaluate whether the defendants

---

1. The Court will use the term "developer" to refer to Pacific Golf and Mr. Sarbaz collectively except where otherwise indicated.

violated those laws, either by employing a device to defraud, making material misrepresentations or omissions, or engaging in a practice that operates as a fraud. Finally, if it finds that there were violations, the Court will then consider whether there is a reasonable likelihood of future violations such that the Court should issue a permanent injunction.

## B. The Project's Concept and the Process for its Development

6. The project is located on a 1,375–acre site in Lucerne Valley, an unincorporated area of San Bernardino County, California. Lucerne Valley is part of a region referred to as the High Desert. Local realtors estimate that the population of Lucerne Valley is approximately 10,000 people. Lucerne Valley is located on the southwestern edge of the Mojave Desert and encompasses about 400 square miles. The project is approximately twelve miles east of the city limits of Apple Valley, thirty-five miles south of Barstow, forty-five miles northwest of Yucca Valley, and twenty-one miles east of Interstate 15. The nearest hospital is approximately 17 miles to the west, in Apple Valley.

7. Mr. Sarbaz began developing Rancho Lucerne in 1988 by acquiring parcels of land that could be put together into one large development. When Mr. Sarbaz first acquired land, there was an alfalfa ranch on some of the property and a few homes, some of which were abandoned. Mr. Sarbaz plans to develop Rancho Lucerne by constructing a twenty-seven-hole public golf course that features replicas of holes of other well-known golf courses around the world and by developing lots for the construction of homes by either commercial home builders or individual purchasers.

8. In order to develop lots suitable for home construction, two types of improve-ments are necessary. The first type is so-called "backbone infrastructure," which consists of the construction of main access roads, sewage lines and treatment facilities, utility connections, and water lines. The second type is so-called "in-tract" improvements, which consist of connecting utilities to the individual lots, including water and sewage lines, and grading the individual lots. When both backbone infrastructure and in-tract improvement are complete, the lots are known as "finished lots." When backbone infrastructure is complete, but in-tract improvements still need to be completed, the lots are known as "superpads."

9. The development of Rancho Lucerne depends in part on obtaining necessary government approvals and permits known as "entitlements." In April 1991, the San Bernardino County Board of Supervisors ("the Board") approved a General Plan amendment. In August 1996, the Board certified an Environmental Impact Report ("EIR") for the project and changed its zoning classification. In July 1997, the San Bernardino Planning Commission approved a Master Tentative Tract Map and a Final Development Plan for the Project.

10. The project is divided into certain numbered "areas." Each area contains a certain number of lots. Before specific lots may be improved, the developer will need approval from San Bernardino County of an implementing individual tract map for each area. Once an implementing final tract map has been approved for an area, the lots within that area can be improved and/or sold.

## C. The Principals

### 1. Mr. Sarbaz and Pacific Golf

11. Pacific Golf is a limited liability company formed under California law in approximately 1995 to serve as the devel-

oper of the project. Pacific Golf has a limited operating history and no assets, and is pursuing no development other than Rancho Lucerne. Mr. Sarbaz, who has acted as the managing member of Pacific Golf since 1995, is the company's only employee. Mr. Sarbaz has no other employment outside his work with Pacific Golf.

12. Before Pacific Golf became the developer for the project, a company known as Pico Investment Company ("Pico") served as the developer from 1988 to late 1995 or early 1996. Mr. Sarbaz acted as Pico's president. Several lawsuits were filed against Pico, and it is no longer an active company.

13. Before working on Rancho Lucerne, Mr. Sarbaz developed real estate in the Los Angeles area, including small retail centers known as "mini-malls" or "strip malls" and one small office building of approximately 30,000 square feet.

14. Prior to beginning his work on Rancho Lucerne, Mr. Sarbaz had only limited experience in developing planned communities. From approximately September 1993 through the end of 1994 or early 1995, Mr. Sarbaz was involved in an investment group that purchased three unsuccessful master-planned real estate developments from banks and the Resolution Trust Corporation in foreclosure auctions. While Mr. Sarbaz was involved in that investment group, none of those developments sold any lots to home builders.

15. Mr. Sarbaz began his involvement with Rancho Lucerne in 1988 when various partnerships he formed with family members began acquiring the land that now constitutes the development. Those partnerships included Lucerne Valley Partners, Wilshire Road Partners, Club View Partners, and Monaco Investment Company. Mr. Sarbaz's partners in those enti-

ties included his brothers, sister, wife, and mother-in-law. Those partnerships acquired a total of 1,362 acres of the project for approximately $2,469,000, or, on average, $1,812 per acre. *See* Ex. 265 at 28 (LH01202).

16. In 1996 and 1997, Mr. Sarbaz's partnerships merged into limited liability companies known as Lucerne Valley LLC, Wilshire Road LLC, Club View LLC, and Makasa LLC. Those entities and Monaco Treasures, Inc., now own the land comprising the development. Mr. Sarbaz is a managing member of Wilshire Road LLC, Club View LLC, and Makasa LLC.[2]

17. Several entities controlled by Mr. Sarbaz have filed for bankruptcy. Club View Partners filed for bankruptcy in 1993, Wilshire Road Partners filed for bankruptcy in 1994, and Jilman Partners filed for bankruptcy in 1994. All of those bankruptcy petitions were ultimately dismissed. At the time they filed for bankruptcy, both Club View Partners and Wilshire Road Partners owned property within the project. Creditors of Club View Partners initiated an involuntary bankruptcy proceeding in January 1997. That petition was dismissed when Mr. Sarbaz reached a settlement with creditors.

18. Mr. Sarbaz was named as a defendant in five other collection lawsuits seeking unpaid fees. Default judgments in excess of $310,000 have been entered against Mr. Sarbaz in four of those suits, and one of the suits is still pending. Mr. Sarbaz and his brother, Mr. Kourosh Sarbaz, have also settled another suit in which they have agreed to pay certain sums to the plaintiff and her attorneys over time.

19. Pacific Golf is currently in default of obligations to pay the principal amount of bonds that were due in July 2000 and

2. The Court will refer to these companies collectively as "the property owners."

the interest on other bonds that was due on January 1, 2001, and January 15, 2001.

### 2. Mr. Fitzgerald and PGG

20. PGG has been registered with the SEC and the NASD since 1995. The firm's primary business is underwriting municipal bond offerings, primarily in California.

21. Mr. Fitzgerald has worked in the securities industry since 1985 and specializes in municipal bond underwriting. Mr. Fitzgerald has licenses from the NASD that permit him to act as a municipal securities representative, a municipal securities principal, and a uniform securities agent. Mr. Fitzgerald has served as the lead investment banker for the underwriting of over one hundred bond issuances since 1989.

22. Since 1995, Mr. Fitzgerald has worked as an investment banker and has served as the Chairman of the Board of Directors and Chief Executive Officer of PGG. Mr. Fitzgerald owns approximately sixty-five percent of PGG. Mr. Arch Zellick and Mr. Dan Young own the remaining thirty-five percent of the firm.

23. An underwriter of municipal securities is a broker-dealer that purchases some or all of the bonds issued and attempts to sell those bonds to investors. An underwriter may associate with other broker-dealer firms to sell the bonds. The underwriter and associated broker-dealers, if any, use a preliminary official statement and an official statement that describe the investment to solicit purchasers for bonds. Upon closing of the offering, the underwriter provides a copy of the final official statement to each purchaser. The underwriter earns a fee for its services by buying the bonds at one price and selling the bonds at another price.

24. In addition to their role as underwriter, Mr. Fitzgerald and PGG also served as financial advisers to the issuer on four bond offerings related to the project in 1999 and 2000.

25. On November 12, 1997, the Commissioner of Corporations of the State of California filed a complaint against Mr. Fitzgerald and PGG, alleging violations of California corporate securities laws in connection with municipal securities offerings related to other land developments in California. On February 17, 1999, Mr. Fitzgerald and PGG entered into a settlement agreement under which the defendants agreed to the issuance of a Desist and Refrain Order by the Commissioner. That order requires the defendants to conduct their business in accordance with certain disclosure and sales practices requirements specified in the settlement and to pay part of the Commissioner's litigation costs. The agreement can be dissolved after five years if the defendants do not violate its terms. The Commissioner later filed a motion seeking a permanent injunction and civil penalties against the defendants for alleged violations of the settlement agreement, but the motion was denied.

### D. The Defendants' Role in Financing the Project

#### 1. The Nine Offerings

26. The public improvements for the project have largely been financed pursuant to the Marks–Roos Local Bond Pooling Act ("Marks–Roos"), Cal. Gov't Code §§ 6500 *et seq.* That Act enables local government entities to collectively issue tax-exempt municipal debt as a joint powers authority ("JPA").

27. There have been a total of nine offerings by several different entities that have issued debt to finance the project. Those offerings include: (1) the $4,430,000

Lucerne Valley Public Financing Authority Revenue Notes 1996 Series A ("First Offering"), which closed on August 15, 1996; (2) the $3,750,000 Rancho Lucerne Valley Public Financing Authority 1996 Revenue Notes ("Second Offering"), which closed on December 31, 1996; (3) the $10,000,000 Rancho Lucerne Valley Public Financing Authority Revenue Bonds $9,550,000 1997 Series A and $450,000 1997 Series B (collectively, the "Third Offering"), which closed on July 31, 1997; (4) the $10,200,000 Rancho Lucerne Valley Public Financing Authority Revenue Bonds 1998 Series A ("Fourth Offering"), which closed on August 1, 1998; (5) the $5,875,000 Chimney Rock Community Association Certificates of Participation 1999 Series B Offering ("Fifth Offering"), which closed on December 31, 1999; (6) the $14,500,000 Chimney Rock Community Association Lease Revenue Bond 1999 Series A ("Sixth Offering"), which closed on January 19, 2000; (7) the $14,000,000 Legends Golf Course Community Association Lease Revenue Bonds 2000 Series A ("Seventh Offering"), which closed on April 28, 2000; (8) the $8,500,000 Legend Golf Club Community Association Lease Revenue Bonds 2000 Series B ("Eighth Offering"), which closed on June 15, 2000; and (9) the $13,500,000 Desert Tortoise Public Financing Authority ("DTPFA" or "Authority") Revenue Bonds 2000 Series A ("Ninth Offering"), which closed on December 29, 2000.

28. Each offering is sold by an Official Statement describing the project and how the proceeds from the bonds will be used. *See* Exs. 244 (First Offering); 65 (Second Offering); 75 (Third Offering); 29 (Fourth Offering); 158 (Fifth Offering); 159 (Sixth Offering); 418 (Seventh Offering); 301 (Eighth Offering); 419 (Ninth Offering).

29. PGG was the underwriter for all nine of the offerings, and Mr. Fitzgerald served as the lead investment banker for the offerings. Mr. Fitzgerald has read and participated in the drafting of each of the nine Official Statements. *See* Section I.D.3 *infra,* ¶¶ 42–47 (describing Mr. Fitzgerald's role in preparing the Ninth Official Statement).

## 2. Mr. Fitzgerald's Role in Developing the Project

30. Mr. Sarbaz first contacted Mr. Fitzgerald in 1995 to seek assistance in financing the cost of constructing the backbone infrastructure for Rancho Lucerne. When Mr. Fitzgerald and Mr. Sarbaz met, they discussed the possibilities for financing the project, including bank financing and municipal bond financing. Mr. Sarbaz initially sought financing under California's Mello–Roos Community Facilities Act of 1982 ("Mello–Roos"), Cal. Gov't Code §§ 53311–53317.5.[3] Mr. Fitzgerald and Mr. Sarbaz elected not to pursue Mello–Roos financing, instead issuing bonds under Marks–Roos.

31. Mr. Fitzgerald played an active role in helping Mr. Sarbaz move the development forward. In 1995 or 1996, shortly

---

**3.** Under Mello–Roos financing, a local government agency may issue tax-exempt bonds secured by liens on specific parcels of real property. Bond proceeds finance the construction or acquisition of infrastructure in real estate development projects. The bonds are repaid through special taxes that a local government agency (called a "Community Facilities District") imposes on property located in the financing district. The bonds are neither general obligations of the municipal issuer nor personal debts of the property owners. The Mello–Roos statute requires that the land provided as security for the debt have a current appraised value that is at least three times the amount of debt to be issued. That requirement is known as the three-to-one value-to-lien ratio. *See* Disclosure Guidelines for Land–Based Securities ("Guidelines"), California Debt Advisory Commission, 1996, "Introduction" Section, at i, iii, iv, 19, 32.

after discussing the project with Mr. Sarbaz, Mr. Fitzgerald recommended that the developer retain Tyee LLC ("Tyee") to analyze the feasibility of financing the initial stages of the development through a bank loan. In January 1996, Tyee issued a report that recommended that PGG proceed with a $5.1 million, two-year loan. The report expressly disclaimed offering any opinion on Mr. Sarbaz's financial capacity or status as a developer, and recommended that PGG or the prospective lender investigate his finances further. The report was addressed to Mr. Fitzgerald, who testified that he read it. *See* Ex. 243 at CDC 653–54.

32. In April 1996, Mr. Fitzgerald met with representatives of the Lucerne Valley Unified School District ("LVUSD") about forming a JPA to issue bonds to finance the public improvements for the project. The LVUSD serves the area in which the development is being built and operates a high school adjacent to the project. Mr. Fitzgerald also met with representatives of the Waterford Public Finance Authority, with whom Mr. Fitzgerald and PGG had worked on other bond financings. The LVUSD and Waterford formed the Lucerne Valley Public Finance Authority, which issued the First Offering on August 15, 1996.

33. LVUSD officials expressed concerns regarding the feasibility of the project and the value of the land used as security for the First Offering. As a result, the LVUSD withdrew from the JPA in subsequent offerings. *See* Section I.E.2.a.ii *infra*, ¶¶ 70–77 (describing the LVUSD's concerns).

34. In late December 1996, Mr. Fitzgerald met with representatives of the City of San Joaquin about joining the JPA to replace the LVUSD. Mr. Fitzgerald and PGG had worked with San Joaquin on other bond financings. San Joaquin is ap-proximately 200 miles from Lucerne Valley. Waterford and San Joaquin formed the Rancho Lucerne Valley Public Finance Authority on December 19, 1996 and performed the Second, Third, and Fourth Offerings on December 30, 1996, July 31, 1997, and August 1, 1998, respectively.

35. On May 16, 1997, Mr. Fitzgerald sent a memorandum to Mr. Sarbaz regarding steps the developer had to take to advance the project. *See* Ex. 67. Mr. Fitzgerald told Mr. Sarbaz that he should obtain a second appraisal on the property on the instructions of the Authority. Mr. Fitzgerald also told Mr. Sarbaz that he should "secure letters of intent/commitment from merchant builders and Realtors to sell 'paper' lots upon completion." Mr. Fitzgerald also indicated that Mr. Sarbaz should "go after the local paper and kill their reporting efforts." Finally, Mr. Fitzgerald wrote:

This will be a very difficult deal to sell—you are lagging in the entitlement process, the local school district bailed out, the local paper is after you, former partners are after you and so forth. It is time for you to get your act together and fight these battles yourself instead of asking others to do so on your behalf.

36. In June 1997, while Mr. Sarbaz was in Turkey, Mr. Fitzgerald sent several memoranda to Mr. Sarbaz in preparation for the Third Offering. In a June 29, 1997 memorandum, Mr. Fitzgerald expressed surprise at Mr. Sarbaz's estimate of $35 million for the cost of public improvements for the first phase of the project. *See* Ex. 71. Mr. Fitzgerald wrote: "Is this [the $35 million estimate] right? If so, we have major problems since you are placing far and away to much debt on 480 acres. You will have to encumber many other properties to make this feasible." In a June 30, 1997 memorandum, Mr. Fitzgerald "strongly suggest[ed]" that Mr. Sarbaz re-

turn from Turkey to meet with investors "as quickly as possible." Ex. 72. Mr. Fitzgerald also asked Mr. Sarbaz to provide three letters from merchant builders voicing interest in buying bulk lots for the project.

37. At least since 1998, Mr. Fitzgerald spoke with several of the project's contractors about the status of their work and about future offerings. In particular, Mr. Fitzgerald met or spoke with officials from Kiewit Pacific Company after Kiewit stopped work on the project in 1999 because it was not being paid. Mr. Fitzgerald also discussed the project with Environmental Enterprises, the public improvements contractor, and Forsgren, the general contractor for the golf course.

38. Mr. Fitzgerald has visited the site of the project approximately fifty times. He visited the property in December 2000 prior to the Ninth Offering.

39. When issuing the bonds, PGG generally receives the bonds at a discount from par and sells them at or near par, thereby generating profit for PGG. Since 1996, the broker-dealer firms participating in the nine offerings for Rancho Lucerne have received approximately $7 million in fees. Of this amount, $2.95 million has been paid to PGG. PGG's fee is significantly higher than the average underwriters' fee reported by the California Debt and Investment Advisory Commission ("CDI-AC"). The defendants maintain that their fees on the Rancho Lucerne project are higher than average because they incur additional costs by performing more extensive due diligence.

40. Mr. Fitzgerald also has interests in Rancho Lucerne beyond his role as the underwriter. Since 1996, Mr. Fitzgerald, Mr. Zellick, and Mr. Young have been the principals of U2ivever, a limited liability company of which Mr. Fitzgerald holds thirty-five to forty percent. U2ivever has a joint venture relationship with Pacific Golf and is entitled to ten percent of the developer's profits on Rancho Lucerne after the payment of all bond indebtedness.

41. These events are not the only occasions on which Mr. Fitzgerald has played a guiding role in the project. His testimony indicates that he is intimately familiar with the development, its progress, and its prospects for success. He has played a significant role in moving the project forward much faster than Mr. Sarbaz would have been able to accomplish without Mr. Fitzgerald's assistance.

### 3. Mr. Fitzgerald's Role in Preparing the Ninth Official Statement

42. The Official Statements for each offering have been prepared by PGG or lawyers working with PGG. Mr. Sarbaz and his planning consultant, Mr. Ray Johnson, have provided information regarding the project to PGG and the lawyers involved in drafting the Official Statements. The first three Official Statements were drafted by the law firm of Flanagan, Mason, Robbins, Gnass & Corman, which also served as disclosure counsel for the issuing authorities. The last six Official Statements, including the Ninth Official Statement, were drafted by the law firm of Ogden Murphy Wallace, P.L.L.C. ("Ogden Murphy") of Seattle, Washington, in its role as "underwriters' counsel." Ogden Murphy has not served as the disclosure counsel, but instead is retained directly by PGG. Ogden Murphy has not been retained to protect the interests of prospective purchasers of bonds.

43. Mr. Philip Miller is the attorney at Ogden Murphy who has been in charge of preparing the Official Statements. Mr. Miller also drafted the preliminary Official Statement for the Ninth Offering and sent it to Mr. Fitzgerald. Mr. Fitzgerald read

drafts of the preliminary Official Statement and provided comments to Mr. Miller. Mr. Miller then revised the preliminary Official Statement and had it printed. The preliminary Official Statement was used by PGG to solicit purchasers for the Ninth Offering. Mr. Miller also prepared the final Official Statement.

44. Mr. Miller also sent a draft of the Ninth Official Statement to Mr. Sarbaz by electronic mail. Mr. Sarbaz reviewed portions of the Ninth Official Statement. In the draft that Mr. Miller sent to Mr. Sarbaz, the Statement already contained the section entitled "Developer's Profit" that appears on page 34 of the final version.

45. In the summer of 2000, Mr. Fitzgerald met with representatives of the Mariana Ranchos County Water District ("MRCWD") to discuss its participation in the DTPFA and the status and plans for Rancho Lucerne. In July 2000, Mr. Fitzgerald sent the MRCWD a letter answering detailed questions about the project and predicting that the developer would earn a $10 million profit. *See* Ex. 318. In the letter, Mr. Fitzgerald also represented that "[t]he Developer expects to execute contracts to sell Areas 2, 3, 7 & 8 in the near future, resulting in the redemption of more than $9,000,000 in outstanding municipal debt." Following these discussions, on November 1, 2000, the MRCWD became a member of the Authority. On November 18, 2000, when the Authority authorized the Ninth Offering, the developer still did not have a contract to sell Areas 2 and 3. Mr. Fitzgerald failed to inform either the MRCWD or the Authority of that fact.

46. In November 2000, Mr. Fitzgerald prepared a term sheet for the Ninth Offering, as he had done for the prior eight offerings. Included in the term sheet for the Ninth Offering was an explanation of how the developer expected to make a profit from the project. At a workshop with the members of the DTPFA on November 18, 2000, Mr. Fitzgerald presented the term sheet and explained the offering. Mr. Fitzgerald predicted that the developer would realize profits of $5 million to $8 million from phase II of the project. Mr. Fitzgerald also distributed to the attendees a letter dated November 16, 1999 from Mr. Lee Hill, an appraiser who assessed the value of the 467 lots in phase II at $23,850 per lot. Moreover, Mr. Fitzgerald told the participants that the project was nearly ready for road paving and that he expected the paving to be completed in December, even though he knew at the time that all construction of public improvements relating to the water and sewer and roads had been halted on the instructions of the San Bernardino County Land Use Services Department and that further construction could not proceed until that instruction was withdrawn and the general contractor was paid.

47. Mr. Fitzgerald made additional presentations concerning the Ninth Offering to the Authority on December 2, 5, and 9, 2000. At one or more of those meetings, Mr. Fitzgerald told the participants that the developer had obtained an offer from a merchant builder for 114 lots at the expected prices. Mr. James Woody, who attended these meetings as the secretary of the Authority and a representative of the MRCWD, understood Mr. Fitzgerald to say that the merchant builder was offering to purchase the lots at prices consistent with those assumed by Mr. Hill in his November 16, 1999 appraisal letter. Mr. Fitzgerald failed to inform the Authority that the developer had a sales agreement at prices ranging from eighteen to twenty-two percent below those assumed in Mr. Hill's appraisal.

## E. Problems Identified with the Project

48. Throughout the course of developing Rancho Lucerne, Mr. Fitzgerald and

PGG have been made aware of several potential problems with the project. Among other issues, various entities have expressed concerns about whether the developer will be able to repay bondholders with proceeds from the project in light of the substantial debt the project has incurred.

### 1. How the Developer Intends to Repay Bondholders

49. The structure and terms of eight of the nine Rancho Lucerne bond offerings have been largely identical. In each case, the bonds are payable solely from the potential revenue from the project and do not constitute a debt of the issuer or any other governmental entity.

50. The bulk of the bond repayments—including for the Ninth Offering—are to come from "Project Impact Reimbursement Fees," which are fees the developer has pledged to pay from the proceeds of lot sales. Those fees are secured by liens that the developer and the relevant property owner have agreed to impose on lots pledged as security property for each of the bond issuances. As a result, full repayment of the bonds is entirely dependent upon the developer's ability to develop lots and sell them at prices sufficient to retire the outstanding liens on the lots.

51. The Official Statement cautions: "No representation has been made regarding the sufficiency of potential Project Impact Reimbursement Fees to repay the Bonds." Ex. 419 at 16. There are several other warnings that no assurances can be given that the Project Impact Reimbursement Fees, the developer's resources, and

foreclosure on the real property (either individually or in combination) would result in sufficient proceeds to repay the bonds. *See id.* at 16–17, 19, 21, 29, 34, 35–44.

52. Some of the debt from the earlier offerings has been retired in the course of subsequent offerings. However, none of the debt that has been retired was paid by revenues from the project. Instead, all of the debt that has been repaid was financed through additional offerings. The Ninth Official Statement does not disclose that fact.

### 2. The Debt Incurred on the Project and Whether the Developer Can Repay Bondholders

53. The project is encumbered with substantial debt. In the course of the eight prior offerings, the project has incurred approximately $70.8 million in debt, of which approximately $53.7 million is outstanding. The debt from those offerings that has been retired, approximately $17.1 million, was repaid through additional bond offerings, not from project revenues. If the Ninth Offering is fully sold, the project will have been encumbered with approximately $84.3 million in debt, of which approximately $63.9 million will be outstanding.[4]

54. The Official Statement for the Ninth Offering identifies the bonds outstanding from the earlier eight offerings. For each of these prior bond issuances, the Official Statement provides the total amount of bonds issued, the maturity date, the shortfall in remarketing the bonds, the remaining principal balance outstanding at

---

4. Approximately $3.2 million of debt from the earlier offerings will be retired with the proceeds from the Ninth Offering (including $2.35 million in certain bonds that were exchanged directly for the bonds constituting the Ninth Offering and $0.9 million in bonds

that will be retired by the developer with proceeds from land purchases), so the Ninth Offering will not increase the amount of debt outstanding on the project overall by the full $13.5 million of the Ninth Offering.

the close of the Ninth Offering, and whether the bonds are in default. *See* Ex. 419 at 8–9. The Ninth Official Statement does not, however, present a single figure showing the total amount of debt on the project as a result of all of the earlier offerings.

55. As a result of this substantial debt, the SEC claims that the project is financially infeasible. According to the Commission and its experts, the debt outstanding on the project—and the bonds constituting the Ninth Offering in particular—cannot be repaid with revenues from the project. To support that contention, the SEC cites the total amount of encumbrances on the development, the appraised value of the land as determined by one of the SEC's experts, and the conclusion of another expert retained by the SEC that neither the superpad lots nor the finished lots will be sufficiently valuable to be sold at prices that will pay off the debt.

56. There is no dispute among the parties about the total encumbrances created by the nine offerings. However, there is substantial disagreement between the parties regarding the revenues which will be derived from the project and the value of the land as determined by the appraiser retained by the developer.

### a. Feasibility Studies Performed for the Developer

57. Before meeting Mr. Fitzgerald, Mr. Sarbaz had hired several consultants to assist him in analyzing the costs and feasibility of developing Rancho Lucerne. Several of those consultants analyzed the project assuming that the developer would use Marks–Roos financing, and some of the reports were either incomplete or otherwise unhelpful in assessing the value of the project.

58. In 1993, Mr. Sarbaz retained Mr. Hill to appraise the value of the property.

In 1995, Mr. Fitzgerald recommended that the developer also retain Tyee to analyze the feasibility of financing the initial stages of the development through a bank loan. At trial, the validity of the valuations performed by Mr. Hill were disputed by the parties.

### i. The Tyee Report

59. Tyee is a limited liability corporation in the State of Washington. The three partners or members of Tyee are Mr. Bradley Roberts Corner, Mr. Daniel Pebbles, and Mr. Robert Garrity. All decisions, recommendations, and reports of Tyee required the unanimous consent of all three members.

60. Tyee performed an investigation of the financial feasibility of the Rancho Lucerne project from late 1995 to early 1996. Tyee's investigation of the financial feasibility of the project was limited because Mr. Sarbaz was reluctant to send information to Tyee.

61. Tyee's report indicated that the market for Rancho Lucerne was not positive. One of the analysts at Tyee indicated in deposition testimony that "unless there was something to draw more traffic to the project, that the absorption estimates that we were getting from other people based on existing developments in the high desert area was not positive news." Ex. 458 at 28:13–17; *see* Ex. 271 (containing a draft report with Tyee's findings).

62. Mr. Corner confronted Mr. Fitzgerald with the preliminary results from Tyee's analysis in October and November 1995, notifying him that the project faced stiff competition and a difficult land and lot market. Mr. Corner also told Mr. Fitzgerald that Mr. Sarbaz was unrealistic about the appraised value of the land and the prospects for financing the project.

63. On January 10, 1996, Tyee delivered its written due diligence report to Mr. Fitzgerald. *See* Ex. 305. The conclusions and recommendations of the report were limited to offering an opinion on the financing of a $5.1 million loan from PGG to Mr. Sarbaz, and the report did not draw any conclusions regarding Mr. Sarbaz's financial status or capacity to complete the development. The report recommended that the $5.1 million loan to Mr. Sarbaz be secured by a first position deed of trust on the entire property and that Mr. Sarbaz and all other property owners personally guarantee the repayment of the loan. After receiving the report, Mr. Fitzgerald characterized its conclusions as "stringent." Ex. 458 at 108:1–18. However, the report did characterize the project as a "financially sound development opportunity" in light of the replica golf course and the developer's intention to sell lots at the superpad stage rather than as finished lots. Ex. 305 at 654.

### ii. Mr. Hill's Appraisals

64. Mr. Hill is a member of the Appraisal Institute and is a Certified General Appraiser in three states, not including California. He has been an appraiser for approximately nineteen years and has worked in real estate since 1968. A significant portion of his experience has been in southern California.

65. As early as 1993, Mr. Sarbaz retained Mr. Hill to perform appraisals of the property comprising the project. Mr. Hill produced an initial appraisal in August 1993 and updated it on several occasions.

66. Mr. Hill's August 1993 appraisal valued some of the property comprising Rancho Lucerne at $28,000 per acre *with entitlements*. *See* Ex. 241. As such, Mr. Hill's appraisal assumed that the project would obtain future entitlements; his report was not an estimate of the value of the land in its then-current (less than fully entitled) state.

67. Mr. Sarbaz provided a copy of the August 1993 appraisal to Mr. Fitzgerald and to Tyee. The First Official Statement cited Mr. Hill's August 1993 appraisal as supporting the amount that was to be paid to the property owners for acquisition of the land for public improvements.

68. The Tyee report notes that Mr. Hill's valuation is based on the assumption that a tentative tract map has been recorded even though that level of approval had not yet been obtained but instead was expected to occur within two years. Tyee concluded that Mr. Hill's 1993 valuation at $28,000 per acre was not a current value but a future value. *See* Ex. 305 at CDC 535. One of the Tyee principals also told Mr. Fitzgerald that the appraisal was unrealistic.

69. In his testimony, Mr. Fitzgerald indicated that he has read over a hundred real estate appraisals over the course of his career. He admitted that the August 1993 appraisal was not a then-current valuation of the property. Moreover, Mr. Fitzgerald has been aware throughout the nine offerings that the developer still must obtain certain entitlements from San Bernardino County.

70. Mr. Fitzgerald was specifically informed from separate and independent sources that Mr. Hill's August 1993 $28,000 per acre valuation did not represent the current value of the property comprising the development. In addition to Mr. Fitzgerald's own knowledge of appraisals and the Tyee report, the LVUSD, one of the members of the authority that issued the First Offering, expressed significant reservations about Mr. Hill's methodology and results.

71. In an October 4, 1996 letter to Mr. Sarbaz which was also delivered to Mr.

Fitzgerald, the LVUSD questioned whether Mr. Hill's appraisal was sufficient to justify the Second Offering. Mr. Gary Thomas, the LVUSD Superintendent, noted that "there should be an appraisal prepared by a qualified appraiser showing the fair market value of the property involved as of the date of the appraisal." Ex. 63 at 1. He continued: "We are not seeking a contingent appraisal of what the property 'may' be worth at a future date if certain events take place, but what the fair market value is as of the date of the appraisal." *Id.* Mr. Thomas also indicated that the appraisal should contain comparable sales within Lucerne Valley since some members of the LVUSD believed that the present value of land in the area was worth substantially less than $28,000 per acre. The letter also questioned whether the project had the necessary entitlements to proceed.

72. Around the same time, Mr. Clayton Parker, an attorney for the LVUSD, wrote a series of letters to bond counsel and other participants in the Rancho Lucerne bond offerings—including the defendants—raising questions about Mr. Hill's valuation. In an October 1996 letter, Mr. Parker specifically questioned Mr. Hill's selection of comparable properties, noting that no sales of undeveloped land in the region had exceeded $5,000 per acre. *See, e.g.,* Ex. 92 at 4. In a December 1996 letter, Mr. Parker characterized Mr. Hill's valuations as "unsupported" and indicated that "there are no land transactions approaching the valuation placed upon the project by Mr. Hill." Ex. 172 at 2. In those letters, Mr. Parker also requested that certain statements be added to the Second Official Statement to reflect the potential problems with Mr. Hill's appraisal.

73. Mr. Fitzgerald testified that he believed that the concerns raised by Mr. Thomas and Mr. Parker were unfounded and that their opposition to the Second Offering was motivated by concerns other than the value of the land. He also indicated that he asked Mr. Hill (or asked Mr. Sarbaz to ask Mr. Hill) to update his appraisal to address the concerns raised by LVUSD officials. Mr. Fitzgerald did not, however, request that an independent appraiser evaluate the project, nor did he provide a compelling alternative explanation for the opposition of Mr. Thomas and Mr. Parker to the Second Offering.

74. In response, Mr. Hill updated the August 1993 appraisal in October 1996. Mr. Hill's October 1996 appraisal was derived by comparing the proposed development with similar land sales. Mr. Hill did not include data from the High Desert area and used data from land located far from Rancho Lucerne. Moreover, Mr. Hill concedes that the October 1996 appraisal, like its August 1993 predecessor, was not an "as is" appraisal. *See* Ex. 457 at 157:12–18. However, Mr. Hill reaffirmed his earlier valuation of $28,000 per acre with entitlements.

75. Mr. Hill updated the October 1996 appraisal again with a letter appraisal on November 12, 1996 that once again confirmed his $28,000 per acre valuation. The November 12 letter included some additional analysis of subdivisions in the High Desert area but did not make a detailed comparison of those projects to Rancho Lucerne. Mr. Hill also wrote a letter on December 6, 1996 responding to Mr. Parker and questioning Mr. Parker's qualifications to judge Mr. Hill's appraisals.

76. Mr. Fitzgerald received Mr. Hill's November 12 letter and additional letters from Mr. Parker questioning its validity, as well as Mr. Hill's December 6 response. Mr. Fitzgerald was also aware that it was necessary to close the Second Offering by December 31, 1996 in order to avoid foreclosure on a large portion of the Rancho

Lucerne property to one of Mr. Sarbaz's creditors.

77. The LVUSD declined to participate in the Second Offering for the project. The Second Official Statement summarized Mr. Hill's 1993 and 1996 appraisals and stated that "a member of the Authority expressed concern regarding the opinion of value given by the appraiser. The Authority then requested that the appraiser revisit four projects [in the area]." Ex. 65 at 25. The Second Official Statement did not disclose, as Mr. Parker had requested, information about sales of comparable property in the area for less than $5,000 per acre.

78. Mr. Hill provided another letter update of his appraisal in November 1999, valuing the ninety-three acres of security property for the Ninth Offering at over $11 million, or nearly $120,000 per acre.[5] Like the August 1993 and October 1996 valuations, that valuation was not a current market valuation; it presumed that the lots were finished. However, the November 1999 letter did constitute a discounted cash flow analysis.

79. Moreover, the November 1999 letter failed to deduct some of the costs of constructing the backbone infrastructure necessary to complete the development. Mr. Hill contends that his failure to include the backbone infrastructure costs was an oversight that is actually accounted for in another portion of his calculations, but he admits that his failure to include infrastructure and interest costs in the final conclusion of value for the November 1999 appraisal means that it does not comply with the Appraisal Institute's standards.

80. Mr. Fitzgerald received and reviewed the November 1999 appraisal shortly after it was prepared.

### b. Analyses of the Encumbrances on the Project

81. At trial, the SEC and the defendants presented expert testimony about the projected revenues from the project. The SEC presented the testimony of Mr. Patrick Gibbons and Mr. Robert Steele to demonstrate that the developer cannot repay bondholders with revenues from the project. The defendants presented the testimony of Mr. Robert Reicher to rebut the SEC experts. The various reports of the experts were quite complicated and detailed, and the Court will review them here only to the extent necessary to explain its decision.

### i. Mr. Gibbons' Report

82. Mr. Gibbons is the president of GCI Group ("GCI"), a southern California real estate consulting firm he founded in 1991. GCI provides financial analysis to land developers, home builders, and institutional investors to help them evaluate the viability of various real estate investment opportunities. The SEC called Mr. Gibbons as an expert on the financial feasibility of real estate development and financing.

83. One of the services GCI provides is a financial feasibility analysis, which is a comprehensive review of the revenue and expense projections related to a project, with the intent of developing a comprehensive project cash flow. Based on this projected cash flow, GCI advises clients regarding the estimated need and likely cost of financing and the overall feasibility or viability of the project.

---

**5.** The ninety-three acres of security property for the Ninth Offering contain 467 individual lots. Mr. Hill valued the lots at approximately $23,850 per lot.

84. The first step in a feasibility analysis is called a residual land value analysis. In the context of a residential development, a residual land value analysis is an estimate of how much a home builder should be willing to pay for lots that have been developed to one of three stages: finished lots, superpad lots, or paper lots.

85. In his work at GCI, Mr. Gibbons has performed financial feasibility analyses for approximately 150 projects. Of these, approximately seventy-five involved master-planned communities. Of the master-planned communities Mr. Gibbons has analyzed, all but a handful were located in southern California.

86. In June 2000, Mr. Gibbons was retained by the SEC to evaluate the likelihood that the bonds issued in connection with Rancho Lucerne and underwritten by the defendants would be repaid by revenues from the project. In July 2000, Mr. Gibbons produced a written report in which he analyzed the financial feasibility of the project at the time of each of seven prior bond offerings. *See* Ex. 417. In his report, Mr. Gibbons concluded that since the time of the Third Offering in July 1997, there has been no reasonable basis to believe that revenues from the project would be sufficient to repay the bonds.

87. In December 2000 and January 2001, Mr. Gibbons also analyzed the financial feasibility of Rancho Lucerne at the time of the Ninth Offering. He concluded that at the time of the Ninth Offering, there was no reasonable basis to believe that revenues from the project would be sufficient to repay that offering.

88. Mr. Gibbons used the same basic methodology in both his July 2000 report and in his analyses in December 2000 and January 2001. First, he performed a residual land value analysis to determine the net revenues the project is likely to produce from the sale of lots at the finished lot, superpad lot, and paper lot stages. Mr. Gibbons then compared his estimated residual land values with the lien release amounts imposed on the property at the time of each offering.

89. Mr. Gibbons found that from the Third Offering on, the lien release amounts were consistently higher than the amounts the developer could expect to realize from the sale of lots after accounting for the costs of constructing the backbone infrastructure. Mr. Gibbons also concluded that the lien amounts exceeded the value of the lots in all of the areas serving as security property for the Ninth Offering. This was true at the finished lot, superpad lot, and paper lot stages. Because he determined that expected revenues from lot sales were insufficient to meet the lien release amounts, Mr. Gibbons concluded that there was no reasonable basis to believe that the Ninth Offering could be repaid from lot sales.

90. Mr. Gibbons also reviewed several profit projections for Rancho Lucerne and concluded that they were inaccurate. He reached that view because the projections failed to account for the discounts that the developer had provided in preliminary contracts to sell the lots when considering the sales prices for other lots and had omitted or underestimated certain costs such as backbone infrastructure and interest expenses.

91. However, Mr. Gibbons' analysis contained several problems that undermined its persuasiveness. First, Mr. Gibbons did not account for the potential income derived from the replica golf course or the commercial property, both of which serve as security property for some of the offerings. Second, Mr. Gibbons' analysis focused on the lien release amounts rather than the actual debt outstanding on each lot, thereby overstating the amount

of revenue that the developer would have to generate to be able to repay bondholders. Third, Mr. Gibbons' conclusions relied on a series of assumptions regarding the sale price of finished homes, the costs of construction, and other factors that are subject to dispute. Indeed, both the defendants' expert Mr. Reicher and the SEC's other expert Mr. Steele used different figures for sales prices that would have fundamentally altered the results of Mr. Gibbons' analysis. Fourth, the developer testified that his contracts to sell the lots provided discounts from the expected sales prices to reward the buyers for being the first to join the project. Finally, Mr. Gibbons' analysis was not disclosed to the defendants prior to the SEC filing its complaint.

### ii. Mr. Steele's Report

92. Mr. Steele is a real estate appraiser based in southern California. Mr. Steele has forty-five years of experience as an appraiser, much of it in the southern California area and, more importantly, in the High Desert area where Rancho Lucerne is located. Mr. Steele is a member of the Appraisal Institute and is qualified to render an expert opinion on land valuation. The SEC offered Mr. Steele's testimony to demonstrate that Mr. Hill's appraisals are flawed and that the developer will not be able to repay the bonds connected with Rancho Lucerne.

93. Mr. Steele testified that the real estate market in the High Desert area was dominated by demand from working people who commute to jobs in San Bernardino, Riverside, and Ontario, areas that are to the south of the High Desert area and on the other side of the San Bernardino mountains. In his view, those buyers give careful consideration to the length of their commute to work. Due to the distance of Lucerne Valley from the area's principal traffic corridor along Interstate 15, Mr. Steele noted that the project would ordinarily be at a locational disadvantage compared to other area communities such as Victorville and Apple Valley. However, Mr. Steele concluded that a strong amenity such as the replica golf course would offset the additional distance from the road network, making the project competitive with other planned communities in the area.

94. Mr. Steele asserted that the real property comprising the project had a value of only $5,000 per acre as of July 2000. Mr. Steele arrived at that opinion by first considering the highest and best use of the property. Mr. Steele tested the feasibility of developing the property by comparing the sales price of finished lots in the High Desert area with the cost to construct such lots. Mr. Steele then found eight comparable developments in the area that supported a finished lot sale value of about $30,000. Next, Mr. Steele calculated the cost to construct such lots by taking the offering price of homes in master-planned communities in the High Desert area and deducting from the sales price the cost to construct those homes, using a nationally published cost guide and adjusting for local market conditions.

95. From this analysis, Mr. Steele found that it would cost between $29,000 and $30,000 to construct a finished lot. After adding marketing costs, a seller of such lots would lose money in selling them for the indicated price of $30,000. For these reasons, Mr. Steele concluded that developing the property for finished lots was infeasible. See Ex. 416. As a result, Mr. Steele concluded that the highest and best use for the property was to hold the property with entitlements for future sale. Mr. Steele found seven examples of sales of comparable vacant land with sales ranging from $1,387 to $8,869 per acre. After

considering the differences between those properties and Rancho Lucerne, Steel concluded that $5,000 per acre was an appropriate value for Rancho Lucerne.

96. Mr. Steele also criticized Mr. Hill's appraisals. In Mr. Steele's view, Mr. Hill inappropriately compared the project to properties that were in primary housing areas where housing prices are higher. Mr. Steele also questioned Mr. Hill's absorption rate and Mr. Hill's failure to incorporate infrastructure costs. Mr. Steele also expressed doubt that the replica golf course would generate sufficient rounds played to make a significant difference in his analysis.

97. However, like Mr. Gibbons' analysis, Mr. Steele's analysis did not consider potential revenue from the golf course and the commercial property. While he viewed the golf course as compensating for the project's locational disadvantage, he did not regard it as a significant source of revenue from which bonds could be repaid. Moreover, Mr. Steele's appraisal was not disclosed to the defendants prior to the SEC filing its complaint.

### iii. Mr. Reicher's Report

98. Mr. Reicher is a Vice President of Market Profiles, Inc., a southern California firm that has prepared several prior reports for Pacific Golf. Mr. Reicher has had more than thirty years of experience in evaluating market conditions for residential planned unit developments, many with golf courses. He has knowledge of and experience in the High Desert area. The defendants presented Mr. Reicher to rebut Mr. Gibbons' testimony that the developer could not possibly repay bondholders with proceeds from the project.

99. Mr. Reicher contended that the replica golf course would be a sufficient amenity to attract buyers for the residential lots from a radius larger than tradi-tional residential developments. He also noted that similar replica golf courses have been successful in Texas and Florida. Accordingly, Mr. Reicher concluded that the presence of the replica golf course would raise the market value of the project and assist the developer in retiring the outstanding debt from the nine offerings.

100. In analyzing whether revenues from the project would be sufficient to repay the bonds that have been issued, Mr. Reicher used the same analysis employed by Mr. Gibbons, although he disapproved of that methodology. Mr. Reicher asserted that his sales price and cost assumptions—some of which were modified shortly before his testimony—were more realistic than Mr. Gibbons' and that the developer would be able to repay bondholders under Mr. Reicher's assumptions. Moreover, unlike Mr. Gibbons, Mr. Reicher focused on the actual debt encumbering each area of the project rather than the lien release amounts.

101. However, even Mr. Reicher's analysis shows that the project is burdened with substantial debt. In many cases, his analysis demonstrated that the difference between the debt encumbering various areas and the expected revenue from sales of lots in those areas was quite small, often representing only a few hundred thousand dollars. Even with his relatively optimistic assumptions, Mr. Reicher's analysis showed that the developer may experience significant difficulty in generating sufficient revenue to pay off the bonds, particularly if the developer incurs any additional debt. If any of his assumptions prove to be incorrect—particularly his fluctuating and somewhat questionable estimate of the price per square foot at which homes in the project would sell—his analysis would demonstrate that the developer cannot repay bondholders.

102. In addition, due to the time constraints created by the trial, Mr. Reicher performed only a limited analysis. He essentially used Mr. Gibbons' framework to show how changing certain assumptions would alter Mr. Gibbons' conclusion, but he did not perform his own complete analysis.

103. Mr. Reicher consistently asserted that a market-based evaluation with a discounted cash flow analysis was the standard and more proper method for ascertaining the feasibility of the project. Under such an analysis, Mr. Reicher indicated, the developer would compare the timing of when development costs and debt payments were due in conjunction with when revenues could be realized from the sale of lots. By performing such calculations on a year-by-year basis, the developer could predict whether he would have sufficient cash flow to be able to finance a project.

### c. The Failure to Perform a Discounted Cash Flow Analysis

104. Throughout the course of the project, Mr. Sarbaz and the defendants have failed to perform themselves or have performed by some other entity a discounted cash flow analysis that considers not only the overall costs of developing the project and the revenues generated from the golf course and sales of the lots, but also how those costs and revenues interact with the structure of the outstanding debt. In other words, while the developer and the defendants have relied on analyses that show that the project might eventually generate a profit in the long run because the project's net proceeds might exceed the net cost of improvements, they have not obtained an analysis that considers whether they will have sufficient cash flow to reach that point in light of when the debt from the nine offerings comes due. Put another way, the developer and the defendants have failed to consider longitudinally whether they will be able to meet the project's debt obligations and construction costs relative to the anticipated absorption rates and other revenues. If the developer cannot maintain a sufficient cash flow to pay for the development, the developer will not realize the revenues necessary to repay bondholders even if the project itself might ultimately be profitable.

105. Mr. Fitzgerald has never performed an analysis to determine whether there is a reasonable probability that revenues from the entire development will enable the repayment of all outstanding debt on the property. In Mr. Fitzgerald's view, at the time of the Ninth Offering, a discounted cash flow analysis was unnecessary. Mr. Fitzgerald has instead relied on Mr. Hill's appraisals as to the value of each individual piece of property securing the offerings rather than obtaining an overall cash flow analysis. Mr. Fitzgerald testified that he was "eminently qualified" to conduct his own discounted cash flow analysis had he chosen to do so.

106. The defendants have also never performed an independent analysis of the public improvement costs for the entire development. The only information that Mr. Fitzgerald has seen on the costs of the public improvements has been provided by the developer or the developer's consultants.

107. As the lead investment banker and, in some of the offerings, the financial advisor to the issuer, Mr. Fitzgerald has played a crucial role in setting the maturity schedule for the bonds. Mr. Fitzgerald has not considered any of the absorption rate information in setting the maturity of the bonds. Most of the bonds have relatively short maturity periods ranging from two to six years. These short maturity periods mean that the developer's projec-

tions regarding revenue from the project must be very accurate—although those predictions have been notoriously inaccurate so far, *see* Section I.E.5 *infra*, ¶¶ 138–145—to avoid defaulting on the debt.

108. Prior to the Ninth Offering, Mr. Fitzgerald was made aware of other entities' concerns with whether the project was feasible. In September 2000, SEC staff examined Mr. Fitzgerald regarding whether he had performed a feasibility analysis of the entire project. In December 2000, Mr. Fitzgerald engaged in negotiations with staff from the California Attorney General's Office. In those negotiations, the Attorney General's staff indicated that they wanted PGG to obtain an independent feasibility analysis of several development projects that PGG had helped finance, including Rancho Lucerne.

109. Mr. Reicher's testimony indicated that a discounted cash flow analysis that considers the structure of the debt on a project relative to the timing of revenues from the sales of lots is the standard and appropriate practice for determining whether a development is feasible. *See* ¶ 103 *supra*.

#### d. The Court's Conclusion Regarding the Feasibility of the Project

110. In light of the reports submitted by Mr. Hill, Mr. Gibbons, Mr. Steele, and Mr. Reicher, the Court cannot definitively conclude that the Rancho Lucerne project is financially infeasible. Although the evidence before the Court raises serious and substantial concerns as to whether the project can generate sufficient revenues to repay bondholders, there are certain limited scenarios and assumptions under which the project might be successful, particularly if the golf course proves to be a significant attraction. While bondholders might not be repaid from project revenues, there is a remote possibility that they will be.

Thus, the SEC has failed to establish that the project *cannot* succeed or that the Ninth Offering is a scheme to defraud or operates as a fraud on investors, although it is certainly not far from doing so. As such, the SEC has also failed to show that the defendants therefore employed a device, scheme, or artifice to defraud or engaged in a transaction, practice, or course of business which operates or would operate as a fraud or deceit upon prospective bondholders. However, the Commission has demonstrated at the very least that it is unlikely that the bonds will be repaid from project revenues. Moreover, the SEC has shown that the project is at or very near the limit of the amount of debt it can sustain before it does become virtually impossible to repay investors.

111. The SEC has also failed to show that the defendants acted with an intent to deceive investors as to whether bondholders could be repaid from project revenues. The defendants appear to have believed that the project could be successful, despite the significant evidence (some of which was presented to the defendants after the closing of the Ninth Offering) that the project is burdened with nearly unsustainable debt. While the defendants' belief that the project was feasible may have been unreasonable, the Court cannot find that the project is akin to a Ponzi scheme that has no hope whatsoever of ever repaying investors.

112. The Court's conclusion that revenues from the project might be sufficient to repay bondholders does not mean, however, that the defendants did not otherwise violate the federal securities laws. The defendants' failure to disclose many of the problems with the project in a comprehensive and meaningful way deserves particular attention. *See* Section I.G *infra*, ¶¶ 158–181 (discussing the defendants' alleged omissions of material facts).

### 3. How the Proceeds from the First Eight Offerings Have Been Used and How the Proceeds from the Ninth Offering Will be Used

113. Another concern raised by various entities is how the developer and the defendants have used the proceeds from the nine offerings. In the view of the SEC, the developer has spent an excessive amount on payments to the property owners and the underwriter and on retiring debt from earlier offerings, leaving relatively little for the construction of improvements to the project.

114. Of the approximately $70.8 million raised in the eight offerings that preceded the Ninth Offering, the developer expected to use only approximately $15.5 million for the construction of public improvements, representing less than twenty-two percent of the total proceeds raised. *See* Ex. 400. That amount is derived by examining the Official Statements for those offerings and assumes that each offering was fully funded. The Official Statements also disclose that there have been various shortfalls in remarketing bonds purchased by the issuers. *See* Exs. 244, 65, 75, 29, 158, 159, 418, 301 (containing the Official Statements for the first eight offerings with representations regarding how the developer would use proceeds from each issuance and the amount of each offering subject to remarketing). No evidence was presented—and none of the Official Statements disclose—the actual amount that the developer has expended on the construction of public improvements. As a result of the remarketing shortfalls and the defendants' failure to disclose actual expenditures on infrastructure costs, the Court infers that the actual amount expended on such construction was less than the amount reflected in the Official Statements.

115. The property owners, all of whom involve Mr. Sarbaz and/or his family members, have been paid approximately $12.5 million in a combination of cash and bonds for the acquisition of property for public improvements, representing over seventeen percent of the proceeds raised in the offerings. *See* Ex. 400. Those payments have consistently been made at or above $28,000 per acre, the valuation assigned to the property by Mr. Hill. The developer and the property owners have pledged to pay various amounts to certain entities—including the issuers and the underwriter—from the proceeds of the land purchases, resulting in net proceeds to the property owners of approximately $9.7 million. The defendants contend that a significant portion of the proceeds received by the developer and the property owners have been used to pay off private loans, to purchase bonds from the Rancho Lucerne offerings (thereby giving the developer a stake in the project's success), and to pay the underwriter's discount.

116. Since 1996, the broker-dealer firms participating in the underwriting of Rancho Lucerne bonds have received approximately $7 million in fees. Of this amount, $2.95 million has been paid to PGG. *See* ¶ 39 *supra.*

117. A significant portion of the proceeds from the first eight offerings were used to refund previous issues. Approximately $17.1 million of the $70.8 million raised in those offerings has been used to retire earlier debt, representing over twenty-four percent of the total proceeds. In a letter to the MRCWD in July 2000, Mr. Fitzgerald recognized that the short maturity schedule of the bonds and the resulting need to use proceeds from subsequent offerings to pay prior issuances has caused problems for the project:

> [M]istakes have been made. As I indicated previously, the difficulty has been

trying to time the pay off of outstanding principal to that of certain entitlement approvals. Had bonds matured 5, 10, 15 years from the issuance date, there would not have been any need to refund maturing principal which has been a serious concern expressed by those in Sacramento.

Ex. 318 at 2.

118. Although these amounts—the proceeds spent on infrastructure, the payments to the developer and the property owners, the fees earned by the defendants and other underwriters, and the amount spent to refund previous issues—can be derived by examining each of the nine Official Statements individually, this information is not disclosed in any comprehensive or meaningful way in any of the Official Statements.

119. The Ninth Official Statement indicates how the developer will use the Ninth Offering's proceeds if the Offering is fully sold. *See* Ex. 419 at 9–10. The Statement also discloses that the Offering might not fully sell, resulting in fewer funds for construction and other development. *See id.* at 19. However, the Ninth Official Statement fails to indicate how the proceeds will be used if the bonds are not fully sold.

120. The Ninth Offering, which sought to raise $13.5 million, closed on December 29, 2000. PGG has reported that $6.7 million of the bonds constituting the Ninth Offering had been presold to investors as of that date, with $2,245,000 sold to PGG customers and $4,455,000 ordered by other broker-dealers. PGG did not execute the transactions with other broker-dealers due to a temporary restraining order issued by this Court, *see* Section I.H.1 *infra,* ¶¶ 182–183, but it expects that most if not all of

those purchases will be completed pending the outcome of the present proceedings. The remainder of the Ninth Offering will be sold by means of a remarketing agreement.

121. Of the $6.7 million in bonds from the Ninth Offering that have been sold, $2.35 million of the bonds were (or will be) issued to bond holders of the Chimney Rock Community Association's 1999 Series B Certificates (the Fifth Offering) who tendered their old bonds. In other words, investors who held bonds from an earlier offering whose bonds had matured accepted bonds from the Ninth Offering rather than demanding payment in cash. As a result, of the $6.7 million in bonds from the Ninth Offering that have been sold, only $4.35 million in cash is available for the project.

122. The Ninth Official Statement and testimony at trial indicates that the $4.35 million in cash will be used in the following manner: (1) $130,000 will pay for the Project Fund, which funds capital improvements for the MRCWD unrelated to Rancho Lucerne;[6] (2) $275,000 will pay for the Expense Fund, which pays the costs associated with issuing the bonds such as printing, marketing and advertising expenses, the fees and expenses of the bond trustee and its counsel, and the fees of the bond counsel, the underwriter's counsel, and the underwriter; (3) $500,000 will pay for the Interest Fund, which creates a fund to pay for the first interest payment due on the bonds; (4) $200,000 will pay for the Administration Fund, which is used to pay vaguely defined administrative costs of the DTPFA associated with issuance of the bonds; (5) $810,000 will be paid to the defendants and other broker-dealers as their discount; and (6) $2,435,000 will pay

---

**6.** This payment effectively serves as the developer's payment to the MRCWD in exchange for its participation in the DTPFA.

for the Acquisition Fund, which represents the costs of infrastructure and purchases of land from the developer and the property owners.

123. If the Ninth Offering fully sells, the Acquisition Fund will amount to $8,064,000. The Ninth Official Statement indicates that the Acquisition Fund was originally intended to fund: (1) $2.4 million for the construction of public capital improvements for the golf course and residential development; (2) $1.2 million for the seeding of the golf course and the construction of a temporary clubhouse and other structures; (3) $1,512,000 to acquire fifty-four acres of land (described vaguely as "Public Lands easements") from the developer and the property owners at a price of $28,000 per acre; (4) $602,000 to acquire fourteen acres of property for the golf course from an affiliate of the developer at $43,000 per acre; and (5) the refund of $2.35 million from the Fifth Offering. *See* Ex. 419 at 9.

124. If the Ninth Offering does not fully sell, the Acquisition Fund will not be fully funded. Given the present sales of the Offering, there will only be $2,435,000 for the Acquisition Fund. *See* ¶ 122 *supra.* If the defendants do not sell additional bonds, then the proceeds from the Acquisition Fund will be used to fund: (1) $341,000 for completed but unpaid infrastructure work on the project; (2) $600,000 for the fourteen acres of golf course property; and (3) $1,494,000 to purchase almost all of the fifty-four acres of "easements." Applying the proceeds in that manner would leave the Fund $18,000 short of the total necessary to complete the purchase of the easements and $2,000 short of the amount needed to complete the purchase of the golf course property.

125. As a result, in the Ninth Offering's present state, its proceeds will not be used to finance the construction of any new infrastructure. Instead, other than the payment of $341,000 to a contractor for prior work, all of the funds will be used to pay members of the DTPFA, the underwriters, various attorneys, and the developer and property owners. No real progress will be made toward creating new value in the project.

126. The Ninth Official Statement does not disclose this possibility in a meaningful way. The Statement does not disclose the expected use of the funds available at closing, nor does it disclose, either in words or numbers, that the amount of funds available at closing will not pay for the construction of additional infrastructure.

### 4. The Developer's Contracts with Potential Buyers of the Lots

127. The Ninth Official Statement, in a section entitled "Merchant Builder Sales," describes agreements secured by some of the property owners to sell the lots from the project. *See* Ex. 419 at 27–28. The Official Statement indicates that one of the property owners signed a contract with Colony Associates, L.L.C. ("Colony"):

In June 1999, one of the Property Owners entered into a contract to sell Area 34 to Colony Associates, L.L.C. for a price which would have generated sufficient net revenues after reimbursement for the estimated on-site in-tract improvement costs to make the payments due with respect to the 1999 Series B Certificates.... The Developer anticipates that the transaction with Colony Associates, L .L.C. will proceed when Area 34 is fully entitled and ready for construction of improvements. The Authority and the Developer anticipate that Project Impact Reimbursement Fees by the Developer with respect to the Bonds from the sale of Area 34 will be available to fund some of the additional public capital improvements need-

ed for the residential development of the Security Property.

*Id.* The Statement also represents that Colony has signed a contract to purchase Area 12, an area that was not part of the security property for the Ninth Offering, on similar terms.

128. The Official Statement also describes a contract with Hertel Development Corporation ("Hertel") "to purchase Areas 7 and 8 on similar terms which the Developer anticipates will be [sic] allow funding of the on-site in-tract improvements and generate proceeds adequate to make all public financing payment obligations associated with Areas 7 and 8." *Id.* at 28. Like Area 12, Areas 7 and 8 are not part of the property constituting the security for the Ninth Offering.

129. The Official Statement also cautions that the contracts are subject to certain conditions. "Each of the agreements contain deadlines for approval of entitlements which may not be met. The Developer believes that the respective purchasers will agree to appropriate extensions. The agreements also contain other performance conditions which could allow them to be rescinded." *Id.* The Statement refers readers to summaries of the contracts contained in Appendix I. *See id.*

130. Appendix I of the Ninth Official Statement, entitled "Merchant Builder Materials," contains amendments to the contracts with Colony and a copy of one of the contracts with Hertel. It does not contain a complete copy of the Colony contracts.

131. Mr. Sarbaz testified that Colony is a real estate broker, not a merchant builder. It was his understanding of the Colony contracts that Colony would resell the lots after it finds merchant home builders or individual purchasers to buy them. Mr. Sarbaz also admitted that Colony has never paid any of the escrow deposits re-quired under the agreements despite signing the original agreements in June 1999 and extending the agreements in November 2000. Mr. Sarbaz further admitted that he does not know whether Colony has the financial resources to pay the purchase prices specified in its agreements. Moreover, Mr. Sarbaz conceded that, in June 1999, when Colony signed the original agreements with Wilshire Road LLC and Club View LLC, Wilshire Road LLC paid Colony $3,200 as required by the contract.

132. The Colony contracts also contain liquidated damages clauses that only require Colony to forfeit its (as yet unpaid) escrow deposits. *See* Ex. 307 at 6, ¶ 6(a) (containing the Wilshire Road contract); id. at 5–6, ¶ 6(a) (containing the Club View contract). On one of the contracts, the initial escrow deposit is only $76,000 even though the sale price of the contract is nearly $4 .5 million; on the other contract, the initial deposit is $85,000 with a purchase price of over $4.9 million. Moreover, there are numerous conditions in the contracts such as the developer obtaining certain entitlements and constructing all off-site improvements such that the Colony contracts can at most be considered option contracts to resell real estate rather than bona fide contracts to sell lots to a home builder.

133. The Hertel agreement contains similar provisions. Hertel has paid only a $10,000 escrow deposit. That deposit is fully refundable until Hertel reviews the property. As with the Colony agreements, the sole remedy against Hertel if Hertel defaults on the contract is the forfeiture of Hertel's deposit. *See* Ex. 308, at 14, ¶ 8.1. The Hertel agreement is also subject to numerous contingencies that have not yet been met, such as completion of the infrastructure, recordation of subdivision maps, completion of the golf course and construction of a golf course clubhouse, and the

developer's preparing and adequately funding a master marketing program for the project. Hertel's obligation to submit an additional $330,000 deposit into escrow similarly depends on a marketing program and the completion of street and landscape improvements. The Court concurs with Mr. Steele's conclusion that the Hertel agreement is more properly characterized as an option agreement, not a bona fide real estate sales contract.

134. The Ninth Official Statement discloses that the finished lot prices in the Colony agreements are 6.4% below the values set forth in Mr. Hill's appraisals. The Official Statement further describes the Hertel agreement as containing similar terms to the Colony agreements. In fact, the finished lot prices specified in the Hertel agreement are between eighteen and twenty-two percent below the values set forth in Mr. Hill's appraisals.

135. Moreover, the Court notes that the prices specified in the Hertel and Colony agreements indicate that the revenue paid to the relevant property owner shall be reduced by the costs incurred by the buyer in completing the in-tract improvements for each lot. In other words, if the relevant buyer (Colony or Hertel) chooses to improve the lots from superpad status to the finished lot stage, the property owner will receive less revenue. The Colony agreements estimate lot finishing costs at $13,000 per lot, and the Hertel contract estimates that the lot finishing costs are $11,000 per lot. Any funds that Hertel or Colony advance to the property owner for lot finishing costs are deducted from the purchase price for the lots. Mr. Sarbaz indicated that Pacific Golf itself does not have the resources to pay for the in-tract improvements.

136. Mr. Sarbaz sent Mr. Fitzgerald copies of the Colony agreements shortly after they were signed in June 1999. Mr. Sarbaz also testified that he told Mr. Fitzgerald that Colony was a real estate broker, not a merchant builder. Mr. Fitzgerald acknowledged discussing the Colony agreements with Mr. Sarbaz. Mr. Sarbaz also sent Mr. Fitzgerald copies of the Hertel agreement shortly after it was executed in August 2000.

137. The Court finds Mr. Sarbaz's testimony on these issues to be credible. Mr. Sarbaz readily admitted the true nature of the contracts during his testimony, and he has no motive to falsely implicate Mr. Fitzgerald, who is assisting Mr. Sarbaz in arranging further financing for the project.

## 5. The Developer's Failure to Meet Its Projections

138. Several Official Statements contain projections from the developer regarding revenue from lot sales and the progress of the project. Those projections have consistently proven inaccurate. For instance, the First Official Statement stated that, following completion of entitlements, Pacific Golf estimates that it will take six months to complete construction such that home lots are superpad ready. The Statement also contains a schedule of lot sales showing that Pacific Golf will sell 1,604 lots by 2001, generating net sales revenue of $39,282,000.

139. The Third Official Statement contained sales and financial projections prepared by the developer purporting to show that Pacific Golf would sell 317 lots during 1998 and all phase I lots by 2001, resulting in revenues of $6,378,000 during 1998 and total revenue of $29,364,000 by 2001.

140. The Fourth Official Statement indicated that the developer anticipates that the first finished lots will be ready for sale in spring 1999 and that the first homes could be completed and ready for occupancy in September 1999. The Statement

also stated that the developer expects the first eighteen holes of the golf course to be open for play in September 1999 to coincide with the opening of new homes.

141. The Fifth Official Statement stated that fully entitled lots in Area 34 will be available by for sale by August 2000 and that new homes could be completed and ready for construction by November 2000. It also stated that Pacific Golf anticipates that the first twenty holes of the public golf course will be open for play in summer 2000.

142. The Sixth Official Statement, issued on January 19, 2000, stated that Pacific Golf "anticipates that the first tracts of entitled lots will be ready for sale in March or April of 2000. The first homes could be completed and ready for occupancy in August of 2000." Ex. 159 at 3. It also provided that Pacific Golf anticipates that the first twenty holes of the golf course will be open for play by fall 2000 to coincide with the occupancy of the initial residential development.

143. The Seventh Official Statement indicated that the developer anticipates that the first twenty holes of the golf course will be ready for play in fall 2000. The Statement also indicated that the first fully-entitled residential areas will be ready for sale in July 2000, with on-site in-tract improvements completed sixty days later, meaning that the first homes could be completed and ready for occupancy by October 2000.

144. At trial, Mr. Sarbaz and Mr. Fitzgerald also testified that San Bernardino County must approve an amendment to the project's Final Development Plan and Master Tentative Tract Map permitting an entity other than County Service Area 70 to provide water and sewage services to the project. The evidence demonstrated that the project has been halted pending a resolution of this matter. While the devel-

oper expressed confidence that the County would ultimately accept this amendment, no evidence was offered which would substantiate that expectation. If in fact the amendment is not approved, the project cannot proceed. The Official Statement does not adequately disclose the significance of this uncertainty. See Ex. 419 at 42; id. App. J.

145. None of the developer's projections has ever been met, and the project is two to three years behind the developer's original schedule. The Ninth Official Statement discloses that the developer has consistently failed to meet its projections. See Ex. 419 at 43.

### 6. The Court's Overall Impression of the Project

146. Thus, there is a long series of problems with the Rancho Lucerne development. Mr. Sarbaz is relatively inexperienced in master-planned developments and has suffered a series of legal and financial problems. His projections regarding the project's progress have consistently proven incorrect, and he and his family members own the land comprising the development.

147. Mr. Fitzgerald has had legal trouble of his own. Moreover, he has earned higher than usual fees on a continuing series of bond issuances with short maturity dates that necessitate additional offerings on a regular basis. Mr. Fitzgerald also has an interest in the development through his consulting firm, and he has exerted pressure on Mr. Sarbaz to obtain contracts with merchant builders to demonstrate that the project is moving forward.

148. There are serious problems with the appraisals and feasibility studies performed for the developer by Tyee and Mr. Hill, as demonstrated by the LVUSD's

concerns and by the analyses performed by Mr. Gibbons and Mr. Steele. Indeed, even the report submitted by the defendants' expert Mr. Reicher shows that the project is on the verge of failure, having incurred nearly as much debt as can be expected to be repaid from project revenues. Despite these problems, the developer and the defendants have failed to obtain a second independent appraisal or a discounted cash flow analysis that considers the structure of the debt from the offerings.

149. In addition, the developer has used the proceeds from the offerings to purchase land from the property owners at fairly high values, to retire previous offerings, and to pay high fees to the underwriter, with less than one quarter of the total proceeds financing the construction of infrastructure. If the Ninth Offering does not fully sell, it is possible that none of the funds raised will go toward the construction of new infrastructure.

150. Finally, the defendants have mischaracterized the nature of the property owners' contracts to sell the lots. The contracts with Colony and Hertel are at best option contracts, and Colony is not a merchant builder.

151. Given the combination of these problems, the Court is left facing two divergent views of the project. On one hand, Mr. Sarbaz and Mr. Fitzgerald believe themselves to be daring entrepreneurs facing an uphill battle to develop what might ultimately prove to be a profitable residential development and replica golf course. They maintain that the continual hurdles they have faced may be substantial but are not insurmountable. Given enough capital and more time, one might believe, the developer and the defendants might be able to make Rancho Lucerne work.

152. On the other hand, the evidence also supports a less favorable view of the project. One might regard Mr. Sarbaz and Mr. Fitzgerald as having intentionally used repeated offerings to obtain public financing for infrastructure they know will never be constructed, enabling them to pocket the proceeds from land sales and underwriting fees for their own benefit. The developer and the defendants may have known all along that the project simply could not work, but they may have been able to generate enough documentation (such as inflated appraisals and feasibility analyses) and enough construction to support their efforts to defraud helpless investors. Moreover, they may have entered into what was effectively a sham contract with Colony merely to mislead investors into believing that the developer could sell the lots.

153. The Court does not fully share either of those views. Although there are serious problems with the project, the Court is persuaded that Mr. Sarbaz and Mr. Fitzgerald are making efforts to see the project succeed. While the project is burdened with substantial debt and the developer may not be able to repay bondholders with revenues from the project, the Court cannot conclude that Rancho Lucerne is a Ponzi scheme designed purely to defraud investors. However, the mere fact that the development *might* be financially feasible is not enough to free the defendants from liability. In attempting to sell the project to investors, the defendants must have refrained from making any material misrepresentations regarding the development, and they must have disclosed all material facts necessary to make their representations not misleading.

### F. The Standard of Care for Municipal Securities Underwriters

154. The Court finds that the SEC is not required to submit evidence regarding

the standard of care for municipal securities underwriters. Negligence is typically a jury determination based on an objective standard. The defendants failed to establish that the Commission must submit evidence regarding the general practices of underwriters.

155. In the alternative, even if the SEC were required to submit evidence regarding the standard of care for municipal securities underwriters, the Court finds that the SEC presented sufficient evidence to meet its burden. The testimony of Mr. Gibbons, Mr. Steele, Mr. Reicher, and Mr. Fitzgerald all described standard industry practices in evaluating the feasibility of a land development project and the propriety of a debt issuance on such a project. In particular, Mr. Reicher testified that it is standard practice to perform a discounted cash flow analysis. Significantly, Mr. Fitzgerald acknowledged that his firm is well-qualified to perform such an analysis. Mr. Fitzgerald also testified regarding the standard of care in the underwriting business, as he spent a large portion of his testimony describing the steps involved in a due diligence investigation.

156. The SEC also presented (and the Court took judicial notice of) the Disclosure Guidelines for Land–Based Securities ("Guidelines") published by the California Debt and Investment Advisory Commission. Mr. Fitzgerald testified that he is aware of and has read portions of the Guidelines. Although that document does not create a legal obligation on underwriters, see Guidelines, Executive Summary at iv, it does provide general standards that municipal securities underwriters should follow in issuing municipal debt on land developments.

157. Finally, the materiality of information to investors does not require the presentation of evidence. Instead, the Court as the finder of fact can determine whether a reasonable investor would regard certain information as significant.

### G. The Alleged Misrepresentations and Omissions Committed by the Defendants

158. The SEC alleges that in preparing and disseminating the Ninth Official Statement, the defendants made material misrepresentations and omitted material facts necessary to make the statements made in the Ninth Official Statement not misleading. The Commission alleges that the defendants made misrepresentations regarding: (1) the total debt on the property; (2) the possibility that the bonds could be repaid and the appraised value of the property acting as security for the bonds; (3) the use of the proceeds from the nine offerings; and (4) the nature of the Colony and Hertel contracts.

#### 1. The Total Amount of Debt Incurred on the Project

159. The Ninth Official Statement lists the amount of debt issued and outstanding on seven of the eight prior offerings. See Ex. 419 at 8.[7] The Statement does not, however, provide a single figure identifying the total amount of debt on the project. Instead, an investor would have to add the totals from the offerings described in the Ninth Official Statement to calculate the total amount of debt on the project.

160. Merely informing investors that there are a series of encumbrances on the project and that there is a risk that the developer will not be able to repay bondholders with revenue from the project does

7. The Ninth Official Statement does not disclose the existence of the First Offering, which has been fully retired.

not meaningfully disclose the scope of the debt on the project. Without a comprehensive understanding of the debt structure of the project, an investor cannot appreciate the true magnitude of the risk that the developer will not be able to repay bondholders. Moreover, there is a substantial likelihood that the disclosure of the total amount of debt incurred on the project—in a single figure or in a comprehensive table rather than buried in a long list of offerings—would have been viewed by a reasonable investor as having significantly altered the total mix of information made available. Accordingly, the defendants omitted a material fact—the total debt on the project and the debt's structure—that was necessary in order to make the statements made in the Official Statement, in the light of the circumstances under which they were made, not misleading.

161. During the course of the trial, Mr. Fitzgerald asserted that he did not view the overall debt on the project to be as relevant as the debt on the individual parcels of security property for each offering. In the Court's view, that testimony lacked credibility. Indeed, the Ninth Official Statement cites the so-called "merchant builder" contracts with Colony and Hertel as evidence that the project is on the verge of producing revenue even though some of those contracts involved areas that were not part of the security property for the Ninth Offering.

162. The Court finds that the defendants departed from the standard of care for underwriters by failing to disclose in a meaningful way in the Ninth Official Statement the total debt on the project and the structure of the debt. Mr. Fitzgerald and PGG should have known that a reasonable investor would regard the total debt on the project and its structure as having signifi-

cantly altered the total mix of information made available.

## 2. The Developer's Ability to Repay Bondholders and the Appraised Value of the Property Acting as Security for the Bonds

163. The SEC also asserts that the Ninth Official Statement makes material misrepresentations regarding the developer's ability to repay bondholders with revenues from the project and the value of the property acting as security for the bonds. In support of its contention, the Commission points to the reports submitted by Mr. Gibbons and Mr. Steele, the problems in Mr. Hill's appraisal, and the failure of the developer or the defendants to obtain a discounted cash flow analysis.

164. The Official Statement indicates that the value of the security property must increase before sales of acreage or lots will generate sufficient proceeds to pay bondholders. See Ex. 419 at 40. Moreover, as the Court has previously concluded, see ¶ 110 *supra*, there is a possibility—however remote—that bondholders might be repaid from project revenues. As a result, at the time of closing, the Ninth Official Statement did not contain express misrepresentations regarding the developer's ability to repay bondholders, although it did contain material omissions as described elsewhere in this section that made it impossible for investors to accurately gauge the risk of default.

165. It is central to the Court's analysis that the defendants were not aware of Mr. Gibbons' or Mr. Steele's reports at the time of the Ninth Offering, nor were they aware of some of the specific problems with Mr. Hill's appraisals. It would undoubtedly alter the Court's analysis if the defendants had been aware of those reports prior to the Ninth Offering or if the defendants perform additional offerings in

the future. Similarly, the defendants have now been placed on notice regarding their failure to obtain a discounted cash flow analysis for the project.

### 3. The Use of Proceeds from the Nine Offerings

166. The Ninth Official Statement does not disclose how the developer intended to use the proceeds from the earlier offerings, let alone how the developer actually spent those funds. How the developer has used the proceeds from the eight earlier offerings is relevant to an investor because it indicates whether the developer is using the proceeds wisely to construct infrastructure and develop the project or whether the developer is squandering bondholder's resources on other expenses.

167. The Ninth Official Statement does disclose how the developer anticipates using funds from the Ninth Offering. *See* Ex. 419 at 9–10. Moreover, the Statement predicts that the bonds will be subject to a remarketing agreement. *See id.* at 45. The Official Statement indicates that failure to fully sell the Ninth Offering may prevent the developer from fully funding the Acquisition Fund. *See id.* at 10. It also states that the failure to sell all of the bonds could delay the completion of the public golf course and threaten the sale of the security property, thereby undermining the developer's ability to repay bondholders. *See id.* at 46.

168. However, while the Statement indicates that the developer may not be able to pursue all of the anticipated tasks if the Offering does not fully sell, the Statement does not reveal in what order the developer will spend proceeds from the Ninth Offering in that event. In other words, while the Statement discloses that the developer will not be able to accomplish everything he hopes if the Offering does not fully sell, the Statement does not disclose

which steps are the highest priority for the developer.

169. How the developer will use the proceeds from a less than fully sold Ninth Offering is relevant because it demonstrates to an investor whether the developer is using the bond proceeds wisely. If the developer is using as much of the proceeds as possible to construct additional infrastructure in the residential development and the golf course, there is a greater likelihood that the project will begin to generate revenues to repay the bondholders. However, if the developer is using the proceeds to purchase land from entities controlled by Mr. Sarbaz and his family members at arguably inflated prices, then a prospective bond purchaser might be less sanguine about the possibility of being repaid.

170. There is a substantial likelihood that the disclosure of how the developer intended to use and actually used earlier bond proceeds and how the developer intended to use proceeds from the Ninth Offering if it did not fully sell would have been viewed by a reasonable investor as having significantly altered the total mix of information made available. Accordingly, the defendants omitted a material fact— how the developer intended to and actually used earlier bond proceeds and how the developer intended to use proceeds from the Ninth Offering if it did not fully sell— that was necessary in order to make the statements made in the Official Statement, in the light of the circumstances under which they were made, not misleading.

171. The Court finds that the defendants departed from the standard of care for underwriters by failing to disclose in the Ninth Official Statement how the developer intended to use and actually used the proceeds from earlier offerings and how the developer will use the proceeds from the Ninth Offering if it is not fully

sold. Mr. Fitzgerald and PGG should have known that a reasonable investor would regard that information as having significantly altered the total mix of information made available.

### 4. The Developer's Contracts with Potential Buyers of the Lots

172. The Official Statement describes the Colony and Hertel contracts as sales to "merchant builders." Ex. 419 at 27; *see* Section I.E.4 *supra,* ¶¶ 127–137. Colony is not a merchant builder, and both the Colony agreements and the Hertel agreement more closely represent option contracts than bona fide sales to home builders. Moreover, while the Official Statement discloses the contingencies present in each contract, it does not reveal that the contracts contain liquidated damages provisions that enable Colony and Hertel to cancel the agreements with very small penalties.

173. There is a substantial likelihood that the disclosure of the true nature of those contracts and Colony's identity as a real estate broker rather than as a merchant builder would have been viewed by a reasonable investor as having significantly altered the total mix of information made available, as that information suggests that the developer has not been able to obtain genuine contracts to sell lots in Rancho Lucerne and that bondholders are therefore less likely to be repaid from project revenues. Accordingly, the defendants made a material misrepresentation regarding Colony's identity as a home builder (and a corresponding omission regarding its true identity as a real estate broker) and omitted material facts regarding the true nature of those contracts that were necessary in order to make the statements made in the Official Statement, in the light of the circumstances under which they were made, not misleading.

174. As for the defendants' characterization of the contracts, the Court finds that the defendants departed from the standard of care for underwriters by failing to disclose in the Ninth Official Statement the true nature of the contracts, especially the presence of the liquidated damages provisions. Mr. Fitzgerald and PGG should have known that a reasonable investor would regard that information as having significantly altered the total mix of information made available.

175. As for the defendants' misrepresentation that Colony was a merchant builder and omission of Colony's true identity as a real estate broker, the Court finds that the defendants' conduct represented an extreme departure from the standards of ordinary care which presented a danger of misleading bond purchasers that was either known to the defendants or was so obvious that they must have been aware of it. Because Mr. Sarbaz told Mr. Fitzgerald that Colony was not a merchant builder, the defendants knew or should have known that the Official Statement was false and misleading. Indeed, given the pressure Mr. Fitzgerald exerted on Mr. Sarbaz to obtain contracts with merchant builders to show to investors, *see* ¶ 35 *supra,* the Court infers that Mr. Fitzgerald may have intentionally mischaracterized the nature of the Colony contract. The Court also finds that Mr. Fitzgerald's testimony as to the Colony contract was not credible. Accordingly, the Court finds that the defendants acted with scienter in committing material misrepresentations and omissions regarding Colony.

176. The defendants have failed to establish that they relied in good faith on their counsel in preparing the Official Statement. To establish good faith reliance on the advice of counsel, the defendants must show that they: "(1) made a complete disclosure to counsel; (2) re-

**1024**

quested counsel's advice as to the legality of the contemplated action; (3) received advice that it was legal; and (4) relied in good faith on that advice." *SEC v. Goldfield Deep Mines Co.,* 758 F.2d 459, 467 (9th Cir.1985) (quoting *SEC v. Savoy Industries, Inc.,* 665 F.2d 1310, 1314 n. 28 (D.C.Cir.1981)). Even if the defendants establish a claim of reliance on counsel, that reliance is only one factor to be considered in determining the propriety of injunctive relief. *See Goldfield,* 758 F.2d at 467 (determining that a district court did not abuse its discretion in determining that a permanent injunction was appropriate). Here, Mr. Fitzgerald did not disclose to PGG's counsel that Colony was a real estate broker rather than a merchant home builder. Because he did not make a complete disclosure, Mr. Fitzgerald cannot assert a good faith reliance on counsel.[8]

### 5. The Court's Conclusions Regarding the Alleged Misrepresentations

177. The Court finds that Mr. Fitzgerald was the central figure in obtaining financing for the Rancho Lucerne development. He was more experienced and knowledgeable regarding the financing than either the developer or members of the DTPFA. As a result, other than the information submitted by Mr. Sarbaz, Mr. Fitzgerald was essentially solely responsible for the accuracy of the Official Statements. Indeed, the testimony of Mr. Jim Woody demonstrates that the Authority was essentially a shell organization through which the defendants could perform the financing rather than an active participant in the offerings.[9] Mr. Fitzgerald also drafted the term sheet for the Ninth Offering and otherwise played an active role in the development.

178. Mr. Fitzgerald was presented with a series of warnings that the project was in trouble, but he consistently moved forward in spite of those problems. He ignored the size of the debt burdening the property and the lack of any discounted cash flow analysis of the project, the problems with Mr. Hill's appraisal as raised by the LVUSD, the recommendations in the Tyee report that any financing for Mr. Sarbaz be conditioned on personal guarantees, the short maturity dates for the bonds, the consistently inaccurate predictions of Mr. Sarbaz, and the use of proceeds from the nine offerings to purchase land, pay the underwriter, and retire earlier debt rather than to construct infrastructure. While the Ninth Official Statement may have disclosed many of these problems, the accumulation of negative information about the project persuades this Court that Mr. Fitzgerald was negligent in several ways and reckless in one instance in committing certain material misrepresentations and omissions in the Statement.

179. Counsel for the defendants cite Mr. Fitzgerald's extensive involvement as evidence that he was diligent in ascertaining the feasibility of the project. However, Mr. Fitzgerald's central role does not necessarily mean that he was legitimately concerned with whether his firm should underwrite the bonds. His conduct equally suggests that he had a vested interest in moving the offerings forward because of

**8.** Even if Mr. Fitzgerald had disclosed Colony's true identity to his counsel, the defendants failed to present evidence that Mr. Fitzgerald or PGG relied in good faith on that advice. Accordingly, the defendants lack both a factual and a legal basis for a good faith reliance on counsel defense.

**9.** While some of the members of the earlier authorities were more active in reviewing the bond offerings (*e.g.,* the LVUSD), there is no evidence that current members of the DTPFA engage in any such stringent review of the Official Statements.

the fees he earned as an underwriter and the prospect for sharing in the developer's profits through U2ivever.

180. Indeed, the Court did not find Mr. Fitzgerald's testimony particularly credible. His testimony that he believed that the Authority should simply disclose all of the problems with the project and then let investors decide rang hollow. The Court discerns an overall pattern of disclosing just as much information to investors as is necessary to claim that the Official Statements are literally true without giving investors a true sense of the project's status.

181. Thus, the Court concludes that the defendants committed a series of three material misrepresentations and/or omissions regarding: (1) the total amount and structure of the debt incurred on the project; (2) the use of proceeds from the nine offerings; and (3) the developer's contracts to sell the lots. The Court finds that Mr. Fitzgerald acted negligently as to all three of those omissions or misrepresentations and that he acted with scienter as to the third omission and misrepresentation.[10]

### H. The Procedural History of the Suit

#### 1. The Temporary Restraining Order

182. The SEC filed the present action on December 27, 2000. At the same time, the Commission also applied for a temporary restraining order ("TRO") and a preliminary injunction to prohibit the defendants from selling or attempting to sell any securities issued by, on behalf of, or for the benefit of, the DTPFA, the project, and Pacific Golf.

183. The Honorable Vaughn R. Walker, acting as the duty judge, heard the application on December 27, 2000. Although Judge Walker did not prevent the closing of the Ninth Offering, he did issue a TRO that required any gross proceeds from prior sales of the bonds constituting the Ninth Offering to be retained by the issuer's trustee and that prohibited the defendants from selling any bonds pursuant to a remarketing agreement pending a hearing on the application for preliminary injunction. The stated purpose of the TRO was to preserve all proceeds from the sale of the Ninth Offering so that such proceeds could be returned to the purchasers of those bonds should this Court so direct.

#### 2. The Preliminary Injunction Hearing

184. The Court set a hearing on the SEC's application for a preliminary injunction for January 19, 2001. At that hearing, this Court decided that it needed a more complete factual record to reach a decision, so it ordered that the hearing on the preliminary injunction be consolidated with a full trial on the merits pursuant to Federal Rule of Civil Procedure 65(a)(2). The Court scheduled the trial to begin on Monday, January 29, 2001. The Court also ordered counsel for the parties to meet and confer concerning the precise issues to be tried, what discovery (if any) should be taken, and any other issues affecting the trial.

#### 3. The Trial on a Permanent Injunction of the Ninth Offering

185. At a further pre-trial hearing on January 23, 2001, the parties agreed to limit this proceeding to the question of whether the Ninth Offering should be permanently enjoined by the Court, leaving

---

**10.** These findings should not be construed to suggest that the defendants are not obligated to perform additional disclosures in future offerings (if any) of the negative information that they learned at trial for the first time, such as the reports submitted by Mr. Gibbons and Mr. Steele and the need to perform a discounted cash flow analysis.

the other issues raised in the SEC's complaint for a later proceeding. The parties also agreed that evidence regarding the earlier eight offerings would be admitted only as it related to the defendants' state of mind and that declarations previously submitted for the application for a preliminary injunction would not be admitted in lieu of testimony. The defendants made a limited waiver of their right to a jury trial solely as to the determination of facts necessary to the Court's decision regarding whether to grant a permanent injunction against the defendants. The trial was held from Monday, January 29, 2001 to Wednesday, February 7, 2001.

## II. CONCLUSIONS OF LAW

### A. The Standard for a Permanent Injunction under Federal Securities Laws

1. "The granting or denying of injunctive relief 'rests within the sound discretion of the trial court.'" *SEC v. Fehn*, 97 F.3d 1276, 1295 (9th Cir.1996) (quoting *SEC v. Goldfield Deep Mines Co. of Nevada*, 758 F.2d 459, 465 (9th Cir.1985) (citing *SEC v. Arthur Young & Co.*, 590 F.2d 785, 787 (9th Cir.1979))).

2. An appellate court reviews a district court's grant of a permanent injunction for an abuse of discretion or an erroneous application of the law. *See Fehn*, 97 F.3d at 1295 (citing *United States v. Yacoubian*, 24 F.3d 1, 3 (9th Cir.1994)).

3. To obtain a permanent injunction, the SEC must show that there is a "reasonable likelihood" of future violations of the federal securities laws. *Fehn*, 97 F.3d at 1295 (citing *SEC v. Murphy*, 626 F.2d 633, 655 (9th Cir.1980)). While there is no per se rule requiring the issuance of an injunction when the SEC demonstrates a past violation, the existence of past violations may give rise to an inference that

there will be future violations, and the defendant's current compliance with the law does not mean an injunction is improper. *See Fehn*, 97 F.3d at 1295 (citing *SEC v. Koracorp Indus., Inc.*, 575 F.2d 692 (9th Cir.1978); *Murphy*, 626 F.2d at 655).

4. Predicting the likelihood of future violations requires a court to assess the totality of the circumstances, considering such factors as: "(1) the degree of scienter involved; (2) the isolated or recurrent nature of the infraction; (3) the defendant's recognition of the wrongful nature of his conduct; (4) the likelihood, because of defendant's professional occupation, that future violations might occur; (5) and the sincerity of his assurances against future violations." *Fehn*, 97 F.3d at 1295–96 (citing *Murphy*, 626 F.2d at 655).

### B. The Standards for Violating the Federal Securities Laws

5. The SEC alleges that the defendants violated the antifraud provisions of section 17(a)(1), (2), and (3) of the Securities Act of 1933 ("the Securities Act"), 15 U.S.C. § 77q(a), and Section 10(b) and Rule 10b–5 of the Securities Exchange Act of 1934 ("the Exchange Act"), 15 U.S.C. § 78j(b); 17 C.F.R. § 240.10b–5, by selling securities that they knew or should have known would result in a substantial loss and by making material misrepresentations or omissions in connection with those sales. The SEC also asserts that the defendants violated Municipal Securities Rulemaking Board ("MSRB") Rule G–17 and section 15B(c)(1) of the Exchange Act, 15 U.S.C. § 78o–4(c)(1).

6. Section 10(b) provides that it is unlawful to "use or employ, in connection with the purchase or sale of any security . . . any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate

in the public interest or for the protection of investors." 15 U.S.C. § 78j(b) (West 2000). Rule 10b–5, which implements section 10(b), provides:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails or of any facility of any national securities exchange,

(a) To employ any device, scheme, or artifice to defraud,

(b) To make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(c) To engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

17 C.F.R. § 240.10b–5 (West 2000).

7. Section 17(a) of the Securities Act contains three subsections substantially identical to the three provisions of Rule 10b–5. That section provides:

It shall be unlawful for any person in the offer or sale of any securities by the use of any means or instruments of transportation or communication in interstate commerce or by the use of the mails, directly or indirectly—

(1) to employ any device, scheme, or artifice to defraud, or

(2) to obtain money or property by means of any untrue statement of a

material fact or any omission to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any transaction, practice, or course of business which operates or would operate as a fraud or deceit upon the purchaser.

15 U.S.C. § 77q(a) (West 2000).

8. Similarly, MSRB Rule G–17 provides: "In the conduct of its municipal securities business, each broker, dealer, and municipal securities dealer shall deal fairly with all persons and shall not engage in any deceptive, dishonest, or unfair practice." *SEC v. Dain Rauscher, Inc.*, 1999 WL 1425400, at *2 (C.D.Cal.) (quoting Rule G–17).[11]

9. Section 15B(c)(1) of the Exchange Act provides: "No broker, dealer, or municipal securities dealer shall make use of the mails or any means or instrumentality of interstate commerce to effect any transaction in, or to induce or attempt to induce the purchase or sale of, any municipal security in contravention of any rule of the Board." 15 U.S.C. § 78o–4(c)(1) (West 2000).[12]

10. A misrepresentation or omission is material when there is "a substantial likelihood that the disclosure of the omitted fact would have been viewed by the reasonable investor as having significantly altered the 'total mix' of information made available." *TSC Indus., Inc. v. Northway, Inc.*, 426 U.S. 438, 449, 96 S.Ct. 2126, 48 L.Ed.2d 757 (1976); *see Basic, Inc. v. Levinson,*

---

**11.** A violation of section 17(a) is not appreciably distinct from a violation of Rule G–17, so the Court need not consider Rule G–17 separately. *See SEC v. Cochran,* 214 F.3d 1261, 1264 n. 2 (10th Cir.2000) (analyzing Rule G–17 and section 17(a) together); *Dain Rauscher,* 1999 WL 1425400, at *2 (noting that Rule G–17 requires at least negligence).

**12.** As with Rule G–17, section 15B(c)(1) simply applies sections 10(b) and 17(a) to municipal securities dealers. Accordingly, the Court need not consider section 15B(c)(1) separately from sections 10(b) and 17(a).

485 U.S. 224, 231–32, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988) (quoting *TSC Industries* and adopting its standard in the context of section 10(b) and Rule 10b–5). A defendant's statements "must be viewed as part of a 'mosaic' to see if those statements, in the aggregate, created a misleading impression.... [T]he proper test is not the literal truth or the materiality of each positive statement, but the overall misleading impression that it combines to create." *In re Genentech, Inc., Securities Litigation*, 1989 WL 106834, Fed. Sec. L. Rep. ¶ 94,544, at *3 (N.D.Cal.) (*"Genentech I"*); *see In re Genentech, Inc., Securities Litigation*, 1989 WL 137189, Fed. Sec. L. Rep. ¶ 94,813 (N.D.Cal.) (*"Genentech II"*) ("[W]here statements of a defendant are used to support liability, they are properly considered as part of a relevant context, rather than in isolation."). Indeed, the Ninth Circuit has recognized that a defendant cannot assert that its statements are not misleading merely because every sentence used throughout a statement is accurate and truthful in and of itself. *See SEC v. C.R. Richmond & Co.*, 565 F.2d 1101, 1106–07 (9th Cir.1977) (finding that advertisements were "deceptive and misleading in their overall effect even though when narrowly and literally read, no single statement of material fact was false"); *Genentech I*, 1989 WL 106834, at *3 (discussing *C.R. Richmond* ).

11. To establish violations of section 17(a)(1) of the Securities Act and section 10(b) and Rule 10b–5 of the Exchange Act, the SEC must also show that the defendants acted with scienter, or an intent to deceive, manipulate, or defraud. In the Ninth Circuit, scienter may be established by demonstrating that the defendants acted recklessly. *See Hollinger v. Titan Capital Corp.*, 914 F.2d 1564, 1568–69 (9th Cir.1990) ("Our circuit, however, along with ten other circuits, has held that recklessness may satisfy the element of scien-

ter in a civil action for damages under § 10(b) and Rule 10b–5."). In *Hollinger,* the Ninth Circuit defined recklessness in the securities context:

> [R]eckless conduct may be defined as a highly unreasonable omission, involving not merely simple, or even inexcusable negligence, but an extreme departure from the standards of ordinary care, and which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

*Id.* at 1569 (quoting *Sundstrand Corp. v. Sun Chem. Corp.*, 553 F.2d 1033, 1044–45 (7th Cir.1977)).

12. For violations of section 17(a)(2) or (3) of the Securities Act, however, the SEC only has to show that the defendants acted negligently. *See Aaron v. SEC,* 446 U.S. 680, 697, 100 S.Ct. 1945, 64 L.Ed.2d 611 (1980) ("It is our view, in sum, that the language of § 17(a) requires scienter under § 17(a)(1), but not under § 17(a)(2) or § 17(a)(3)."). To establish negligence, the SEC must show that the defendants failed to conform with the standard of care that a reasonable underwriter in the municipal securities market would exercise. *See Dain Rauscher,* 1999 WL 1425400, at *2; *see also SEC v. Hughes Capital Corp.,* 124 F.3d 449, 453–54 (3d Cir.1997) (defining negligence in the securities context as the failure to exercise reasonable care or competence).

13. Thus, to establish a violation of the securities laws, the SEC must prove at least one of the following three propositions: (1) that the defendants employed a device, scheme, or artifice to defraud, and that the defendants acted with scienter in employing that device (thereby establishing a violation of Rule 10b–5(a) and section 17(a)(1)); (2) that the defendants made an untrue statement of material fact or omitted a material fact necessary in order to

make the statements made, in the light of the circumstances under which they were made, not misleading, and that the defendants acted with scienter (a violation of Rule 10b–5(b)) or negligence (a violation of section 17(a)(2)); and (3) that the defendants engaged in an act, practice, or course of business which operates or would operate as a fraud or deceit, and that the defendants acted with scienter (a violation of Rule 10b–5(c)) or negligence (a violation of section 17(a)(3)).

## C. Whether the Defendants Violated the Federal Securities Laws

### 1. Whether the Defendants Employed a Device to Defraud: Rule 10b–5(a) and Section 17(a)(1)

■ 14. The Court concludes that the defendants did not employ a device, scheme, or artifice to defraud in violation of either Rule 10b–5(a) or section 17(a)(1).

### 2. Whether the Defendants Made Material Misrepresentations or Omissions: Rule 10b–5(b) and Section 17(a)(2)

■ 15. The Court concludes that the defendants made untrue statements of material fact and/or omitted material facts necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading. Specifically, the Court concludes that the defendants committed material misrepresentations and/or omissions in three areas: (1) the total amount and structure of the debt incurred on the project; (2) the use of proceeds from the nine offerings; and (3) the developer's contracts to sell the lots. The Court concludes that the defendants acted negligently as to all three of those areas, thereby violating section 17(a)(2), and that the defendants acted with scienter as to the third area in characterizing Colony as a merchant builder, thereby violating Rule 10b–5(b).

■ 16. Both PGG and Mr. Fitzgerald are liable for the misrepresentations and omissions in the Ninth Offering. Under section 20(a) of the Exchange Act, 15 U.S.C. § 78t(a), and section 15 of the Securities Act, 15 U.S.C. § 77o, a person who controls another person or entity is jointly and severally liable with the controlled entity unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action. Mr. Fitzgerald was a control person of PGG, and he has failed to establish that he acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

### 3. Whether the Defendants Engaged in a Practice that Operates as a Fraud: Rule 10b–5(c) and Section 17(a)(3)

■ 17. The Court finds that the defendants did not engage in an act, practice, or course of business which operates or would operate as a fraud or deceit in violation of either Rule 10b–5(c) or section 17(a)(3) at the time of the closing of the Ninth Offering. However, given the negative information that the defendants learned at trial, including the need to obtain a second independent appraisal and a discounted cash flow analysis, the Court expressly limits this conclusion to the context of the Ninth Offering at the time of closing. The Court takes no position regarding whether any future sales of the bonds in the Ninth Offering would constitute engaging in a practice that operates as a fraud in light of that evidence.

## D. Whether the Court Should Issue a Permanent Injunction Due to a Reasonable Likelihood of Future Violations

■ 18. To determine whether to issue a permanent injunction in light of the

violations of the securities laws committed by the defendants, the Court must decide whether there is a reasonable likelihood that the defendants will commit future violations. As described previously, *see* Section II.A *supra*, ¶¶ 3–4 (outlining the standard for a permanent injunction under the securities laws), the Court must make that judgment by assessing the totality of the circumstances and considering: (1) the degree of scienter involved; (2) the isolated or recurrent nature of the infraction; (3) the defendant's recognition of the wrongful nature of his conduct; (4) the likelihood, because of defendant's professional occupation, that future violations might occur; and (5) and the sincerity of his assurances against future violations.

19. First, the SEC has established that the defendants acted with scienter in characterizing Colony as a merchant builder.

20. Second, the Court concludes that the defendants' infractions are not mere isolated incidents but instead are a recurring feature of the defendants' practices. While the Ninth Official Statement is full of negative disclosures about Mr. Sarbaz and the development, this Court's review of the extensive record in this case leads it to believe that Mr. Fitzgerald has a history of being investigated for his securities practices and making only the bare minimum disclosure necessary to avoid liability. Given how the defendants have disclosed certain facts in the Ninth Official Statement, the Court has little confidence that they will refrain from misleading investors in the future. Moreover, any subsequent sales of bonds from the Ninth Offering (or any future offerings) could easily repeat the misleading statements identified in these findings absent an injunction.

21. Third, the defendants have recognized that the Ninth Official Statement is misleading in several respects and have represented that they will supplement the Ninth Official Statement to address those problems. Indeed, the defendants' proposed findings of fact consistently concede that the Official Statement contains at least one inaccuracy and could be made more clear. The defendants also argue that the Court will retain jurisdiction over the remainder of the SEC's complaint as it relates to the earlier eight offerings, enabling the Court to ensure that the defendants comply with the securities laws. In addition, the defendants have represented that they will permit bondholders who purchased securities in the Ninth Offering to rescind their transactions.

22. However, the Court does not regard the defendants' representations at trial as sufficient to prevent issuing an injunction. If defendants in general were able to violate the securities laws and then simply pledge to disclose harmful evidence that arose at trial (even evidence previously known to them that constituted the factual basis for the violations), there would be little incentive to comply with the securities laws in the first instance. Faced with a court skeptical about its disclosures, any defendant would express wholeheartedly its willingness to supplement its statements. Thus, these defendants' assurances are not enough to persuade this Court that they will refrain from future violations.

23. Fourth, the defendants are undoubtedly in a position to commit future violations because of their professional occupation. In fact, the Ninth Official Statement even suggests that the developer is contemplating another bond offering in the spring of 2001. Moreover, the defendants will continue to sell remarketed bonds absent an injunction.

24. Fifth, having heard the testimony and seen the demeanor of Mr. Fitzgerald, the Court does not find the defendants' assurances against future violations to be credible.

25. The Court therefore concludes that there is a reasonable likelihood that the defendants will commit future violations absent an injunction.

## CONCLUSION

For the foregoing reasons, the Court finds that the defendants have committed several violations of section 17(a)(2) and one violation of Rule 10b–5(b) by making material misrepresentations or omitting material facts that are necessary to make the statements made not misleading. The Court also finds that there is a reasonable likelihood of future violations absent an injunction. Accordingly, the Court hereby determines that an injunction against Mr. Fitzgerald and Pacific Genesis is appropriate and GRANTS the SEC's application for a permanent injunction. The parties shall submit proposed forms of injunctive relief by Thursday, February 15, 2001, at 3:00 p.m., and the Court will hold a hearing on the form of injunctive relief on Friday, February 16, 2001 at 11:00 a.m. The TRO shall continue in effect until the Court issues the permanent injunction.

**IT IS SO ORDERED.**